[Cite as *State v. Erker*, 2019-Ohio-3185.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                                    No. 107790

    v.                               :

RAYMOND A. ERKER,                       :

    Defendant-Appellant.             :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-627482-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carson Strang, Assistant Prosecuting Attorney, *for appellee.*

Paul Daiker Law, L.L.C., and Paul B. Daiker, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1}   Defendant-appellant, Raymond A. Erker, appeals his convictions.  He raises nine assignments of error for our review:

1. The defendant was denied federal and state due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when he was convicted on evidence that was insufficient as a matter [of] law to sustain a conviction for burglary in count one.

2. The defendant was denied federal and state due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when he was convicted on evidence that was insufficient as a matter [of] law to sustain a conviction for menacing by stalking in count two.

3. The defendant was denied federal and state due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when he was convicted on evidence that was insufficient as a matter [of] law to sustain a conviction for telecommunications harassment in count three.

4. The trial court erred as a matter of law and to the prejudice of appellant by denying appellant's motion for judgment of acquittal, as to counts one, two and three of the indictment, pursuant to Crim.R. 29(A).

5. The judgments of conviction as to all counts are against the manifest weight of the evidence.

6. The trial court erred by allowing irrelevant and/or unfairly prejudicial alleged text communications that were outside the dates of the indictment to be presented to the jury.

7. The trial court erred to the prejudice of the defendant by allowing extensive prosecutorial misconduct during closing argument.

8. The trial court abused its discretion to the prejudice of the defendant by allowing testimony about the defendant's pretrial ankle bracelet to be admitted into evidence, as well as the trial court's failure to give a

sufficient curative instruction and/or the [trial] court should have granted defendant's motion for new trial regarding the same.

9. The trial court erred to the prejudice of appellant by providing confusing, misleading and prejudicial jury instructions, thus creating confusion and the possibility of burden shifting, in violation of appellant's state and federal constitutional rights to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Constitution of the state of Ohio.

{¶ 2} Finding no merit to his assignments of error, we affirm.

## I.    Procedural History and Factual Background

{¶ 3} In April 2018, a Cuyahoga County Grand Jury indicted Erker for one count of burglary in violation of R.C. 2911.12(A)(1), a felony of the second degree; one count of menacing by stalking in violation of R.C. 2903.211(A)(1), a felony of the fourth degree; and one count of telecommunications harassment in violation of R.C. 2917.21(A)(5), a felony of the fifth degree.[1]  Erker pleaded not guilty to the charges. The trial court subjected Erker to GPS monitoring as part of his bond.

{¶ 4} The case proceeded to a jury trial in August 2018, where the following evidence was presented by the state.

{¶ 5} Erker married G.S., the victim, in October 2012.  G.S. worked for the congregation of St. Joseph since 2003, and Erker was the chief executive officer for a water treatment company.

---

[1] In the indictment, the date of the offense for the count of menacing by stalking was "on or about March 16, 2018."  In August 2018, the first day of trial, the trial court granted the state's motion to amend the indictment, changing the date of the offense for that count to "on or about June 1, 2016 to March 16, 2018."

{¶ 6} Both Erker and G.S. had children from previous marriages: Erker had three children, and G.S. had two daughters, C.S. and S.S. G.S. and her daughters moved into Erker's home in Avon Lake, Ohio in 2013. After adding an addition onto the home, Erker put the house in his and G.S.'s name.

{¶ 7} G.S. described her relationship with Erker as "up and down" and "contentious from the very start." She said that both her daughters had "up and down" relationships with Erker as well. G.S. tried counseling with and without Erker.

{¶ 8} G.S. said that in 2013, Erker filed for divorce. She also agreed that Erker filed for divorce two more times throughout their marriage.

{¶ 9} In June 2016, G.S. separated from Erker, and she and her daughters moved out of Erker's home. G.S. said she moved out because "[t]here was just a lot of animosity, a lot of abuse, every kind, a lot of emotional [abuse], and [she] finally made the decision that it was enough." Prior to moving out, G.S. received a text message from Erker that read: "Sign the house over and leave. I'll fucking kill you. Like end your life. I will murder you. Like end your life. I will murder you. Dead." G.S. responded to the text, saying, "I'll be sure to keep these." Erker responded, "Dead."

{¶ 10} G.S. moved in with her sister, K.H.J., who lived in Medina, and G.S. stayed with her for three months.

{¶ 11} G.S. said that Erker knew she moved in with her sister and stated that despite moving out, Erker "never stopped" trying to contact her and that there was

an "incalculable" amount of phone calls from him.   G.S. admitted to trying to reconcile her relationship with Erker on numerous occasions and that she spoke with Erker consensually at times.  She explained:

> That time period was very difficult for me.  I was very confused.   I wouldn't say that I was trying to get him back; I was trying to figure out what was going on and what to do with the rest of my life.  I didn't have a place to live.  I was trying to be a parent to my daughters.  There was communication and there was a period of time where I was vacillating.
>
> I'd invested a lot in the relationship.  I was very close to his children.  I loved them.  I was their mother for many years.  I did things for them that their own mother didn't do.  I'd built a family while we were married and my children were close to his children.  Everybody had gone through the process of becoming a family so I was weighing everything, all decisions, very, very carefully and trying to figure out if this could be salvageable.

{¶ 12} During this time, K.H.J. found framed photographs and three vases of flowers in her garage that Erker had left.   There were photographs of G.S., Erker, and the children and a vase for G.S., C.S., and S.S.  G.S. stated that when she found out about the flowers and photos, she was "angry that he once again crossed a boundary and brought them to [her] sister's [house] when he knew they would not want him there."  G.S. said that she never invited Erker to her sister's house.

{¶ 13} Also during the time that G.S. was living with her sister, Erker came to G.S.'s work uninvited to "deliver a new McIntosh computer."  G.S. explained that Erker "had smashed and destroyed the three that [they] had at home and so he bought a new one and showed up unannounced and brought it into [her] work and gave it to [her] there."  She said that Erker wrote on the back of the computer's packaging, "I was jacked up."  G.S. explained that at that time "she was still trying to

not bring [her] coworkers into it" and so instead of making a scene, she walked him outside and told him not to come to her work anymore. Despite that, G.S. said Erker showed up to her work again (although the date is not clear). She described one incident as follows: "He came in * * * when I was in the dining room having lunch with my coworkers and I saw him looking for me so I kind of moved behind one of my coworkers and he didn't find me and I think he left."

{¶ 14} In July 2016, G.S. invited Erker to attend a religious retreat with her, thinking that they could reconcile their relationship. Also during that month, G.S. invited Erker to go visit her uncle in Florida because her uncle had been divorced several times and "thought maybe he could counsel [them]." They, however, did not ultimately go to Florida.

{¶ 15} In September 2016, G.S. rented a house in Strongsville. At one point, G.S.'s landlord forwarded her an email that he had received from Erker on August 19, 2016, approximately one month before G.S. moved in, that — according to G.S.'s testimony[2] — read:

> [Landlord,] This is Ray Erker, [G.S.'s] husband. We need to speak ASAP. Gina is not of sound mind and will not be able to pay you as promised. You are one of many that she has committed to that she cannot and will not pay. She is not well and cannot afford her place on Ash Drive in Strongsville for $1,800 a month.
>
> Furthermore, I am not a gambler, never have been, and am in no way financially irresponsible. I am a successful and prominent business owner and have in no way contributed to [G.S.'s] bankruptcy. In fact, if you check your records, you will see that she filed for bankruptcy in

---

[2] While the record reflects that state's exhibit No. 79 was admitted, the file provided to our court did not contain "the original" exhibit as is required under App.R. 9(A)(1). Nevertheless, G.S. read the contents of the exhibit in court.

2010. We were not even married until 2012. Additionally, she divorced her previously financially solvent husband * * * years earlier, so it was not his fault either.

Please be advised that we are currently involved in legal proceedings and any contracts signed during this time will also be subject to subpoena and investigation. Please feel free to contact me directly at [Erker's phone number].

G.S. stated that she had no idea how Erker knew that she was moving into the Strongsville home and that she never gave Erker her landlord's email address.

{¶ 16} On November 6, 2016, Erker showed up at G.S.'s home around 8:00 p.m. and walked around the house looking into the home. G.S. said she did not invite Erker over. G.S. said she was afraid because Erker was "extremely unpredictable and volatile" and she did not know "if he would break in." G.S. and her daughters went upstairs to hide in a bedroom and called 911. Officers responded to G.S.'s residence and spoke with Erker and G.S. Officer Jacob Knipp testified that G.S. said she did not want Erker at the residence and that officers told him that she did not want him there. Officers stayed at the scene until he left. G.S. felt trespassed against because Erker was "not respecting any boundaries and showing up whenever he wanted."

{¶ 17} According to G.S., after that incident, Erker "was actively professing love and [saying] that [they] need to stay married and work on [the marriage] and go to counseling." Erker, however, told G.S. that he was having an affair with another woman, which, according to G.S., was to make her jealous and "panic that he would be moving on."

{¶ 18} On December 25, 2016, Erker showed up at G.S.'s home after midnight and entered with a copy of the key to her house. G.S. stated that she did not give him a copy of that key. G.S. called 911, and Erker left before officers arrived.

{¶ 19} Officers responded to G.S.'s residence around midnight based on a report that Erker was trying to get into her house and that he was not welcome there. G.S., who was still hiding in the bathroom when officers arrived, was "obviously scared" according to the officers. Officer Aaron Plut testified that G.S. was "visibly upset," "crying," and "appeared to be stressed." G.S. told Officer Plut that Erker made a copy of a key to her residence without her permission and that he used it to enter her house. Officers stated that G.S. showed them her phone and that there was an earlier message from G.S. inviting Erker to come over, but that Erker showed up "much later than she was expecting." Officer Plut testified that based on G.S.'s reaction, Erker was clearly not invited to come to the house at the time he did. G.S. did not complete a statement regarding the incident, but told officers that she did not want Erker to return to her residence.

{¶ 20} After receiving information that Erker left the residence, Officer Knipp testified that he went to intercept Erker on his ride home and conducted a traffic stop of Erker's vehicle. Officers confiscated the key to G.S.'s residence that Erker had and returned the key to G.S.

{¶ 21} G.S. stated that after that incident, she attempted to reconcile with Erker and started having consensual conversations with him in January 2017. In fact, during that month, G.S. invited Erker to a marriage retreat as well as to attend

an event at the Music Box Supper Club. In February 2017, G.S. invited Erker to go see two concerts for the upcoming summer months.

{¶ 22} On April 2, 2017, Erker asked G.S. if he could come to her house so that they could talk about their relationship. G.S. described their discussion as follows:

> It started with talking and it progressed, as it always did, to him immediately pressuring me and demanding when I was going to be moving back home. At that point I looked and said, I'm in no way ready to commit to moving back home.
>
> It was like someone flipped a switch and he completely changed and he came at me and grabbed me by * * * both wrists and said, This is what you might as well be doing to me, and he started to hit himself in the face * * * with my fists and he had such a tight grip on me I couldn't break free so the only thing I could think to do was to drop, like drop kind of like a toddler drops with their weight, drop to the ground.
>
> When I did, my knees were up and he dropped in front of me to his knees and started slamming his face into my knees and I had bruises on my knees and on my wrists from that encounter. He then called me the C word. He spit in my face.

{¶ 23} C.S. was home during the incident and testified that Erker screamed at G.S., called her names, and spit on her. C.S. said that G.S. was sobbing and that she was scared for her and her mother and so she called 911. Officers arrived on scene and spoke with both parties. Officer Fields testified that he noticed a "small superficial mark" on Erker's nose, but that Erker told him that "it was not related to anything" and "had nothing to do with that incident." Officer Fields said he told Erker not to return to G.S.'s home. He also testified that he told Erker that if he returned, he could face criminal charges.

{¶ 24} Officer Fields said that later that day, Erker came to the police station and said he "wanted to make a charge that [G.S.] had injured him[,]" pointing to the injury on his nose. Erker made a statement saying that he came to G.S.'s house unannounced and uninvited and that he shows up there unannounced and uninvited "frequently." Erker alleged that G.S. let him into the home and that things escalated and that G.S. struck him with her fist and knee on his face. Officer Fields testified that he contacted G.S., who subsequently gave a statement regarding the incident. Officer Fields stated that Erker ultimately decided not to pursue charges.

{¶ 25} G.S. stated that after that incident, she went with Erker to watch one of his children's hockey games in Pittsburgh in May 2017, and she admitted that she stayed in the same hotel room with him.

{¶ 26} On May 16, 2017, Erker placed a box on G.S.'s mother's doorstep that had the following written on it: "Hi [G.S.'s mother]. I don't know what I did with your address and this was too important to wait. Please call me once you've had a chance to review. Thank you for listening. Ray." G.S. described the box's contents as follows:

> Ten, 15 different brown paper envelopes all with a different theme, all with red writing on them, and inside was just all different kinds of materials. Some were about — lots of research he had done into borderline personality disorder or bipolar disorder or whatever he was trying to convince others that I had at the time and there was highlighter and circles and underlines and arrows pointing to things, and tabs. The amount of material that was in this box must have taken weeks to compile.
>
> There was also four books, all of the same title. The title * * * was *I Hate You — Don't Leave Me.* It was some sort of self-help book and on each

book there was a Post-It note that had my [three] siblings' names on them and I suppose my mother. There was direction for my mother to pass these books to my siblings so that he could try to convince my family of things.

There was a copy of a DVD. I believe the movie is *What Dreams May Come* which is a Robin Williams movie about his wife committing suicide and going to hell and him saving her somehow. The amount of material that was in this box was unbelievable.

There was also an envelope that had photos of other women and his Match.com communications with those women and a photo of himself and on the front of the envelope it said, I don't need [G.S.]; I want [G.S.]. I love her. This was supposed to show my family how in demand he was with other women.

{¶ 27} The envelopes had "titles" such as "Ray and [C.S.]," "Background and History * * * This says it all," "There's Hope! This makes all the difference! It's never too late to live happily ever after," "This is why I'm still here and then there's this. This makes it all worth it," "Where did this come from? These broken promises left me in confusion? I'm not [G.S.]'s enemy," "I think I am fun[.] I think we do a lot for [G.S.] to insinuate I'm boring and that she'll go with younger guys on Facebook destroyed me and was soooo [sic] hurtful," and "Here's where [G.S.]'s refusal to deal with past trauma's [sic] is ruining her present happiness and now and [her] 2nd marriage and 5 kids['] lives." All of the envelopes contained pictures of text messages between G.S. and Erker and other things relevant to their relationship. Most of the items had handwritten notes from Erker.

{¶ 28} One of the envelopes had the following written on it: "If I'm wrong, then how do you explain all this? If this isn't enough of a wakeup call then let's go through the box I left your mom! Trust me, I'm not wrong about this." Inside that

envelope was a multiple-page handwritten letter telling G.S. that she suffered from borderline personality disorder as well as extensive articles discussing borderline personality disorder with handwritten notes indicating that G.S. had the disorder.

{¶ 29} G.S. said that she was never diagnosed with borderline personality disorder, but explained that Erker, who was not a medical professional, told "anyone who would listen," including her sister, mother, and children, that G.S. suffered from borderline personality disorder.

{¶ 30} G.S. was outraged by the contents of the box and said that it caused her great distress. She felt that he was trying to turn her family against her, but was also trying to remind her of the good times.

{¶ 31} On May 30, 2017, Erker and G.S. dissolved their marriage in Lorain C.P. No. 17NF082768. In July 2016, before the dissolution, G.S. had transferred her interest in Erker's Avon Lake house back to Erker. She testified that she did not want anything to do with the house, Erker did not pay a portion of the value of the home to her, and she did not receive any consideration for the home. She also explained that as part of the dissolution, she did not ask for Erker to pay alimony.

{¶ 32} In June 2017, G.S. went to the Strongsville Police Department to make a complaint, telling officers that "she did not want to pursue any charges but * * * wanted to document some behavior issues with Mr. Erker following her, calling her, texting her, unwanted even though she asked him to cease and desist." Officer Fields testified that he called Erker based on the complaint and that Erker said "he would comply with [G.S.'s] wishes." Officer Fields testified that he received another

complaint from G.S. soon after the first one and that he tried to get ahold of Erker again, leaving a voicemail telling Erker to leave G.S. alone and not to show up at places where she might be. He also told Erker that G.S. did not wish to pursue charges even though the police would typically pursue charges after a person fails to adhere to instructions not to contact another person.

{¶ 33} From July 2017, until December 2017, G.S. and Erker went on a vacation to Hocking Hills and attended a number of events together, including a relationship seminar, an Italian festival, and a concert. During that time, G.S. also asked Erker for financial assistance regarding C.S.'s tuition and Christmas presents. In October 2017, G.S. also invited Erker to attend another concert.

{¶ 34} However, in late December 2017, G.S. decided that her relationship with Erker was finally over, and in January 2018, G.S. said she informed Erker that it was over and that he did not take it well. She said that he "panicked and escalated which is what he always did." G.S. also retained an attorney in January 2018.

{¶ 35} During this time, G.S. testified that Erker began texting her from numerous fake phone numbers. G.S. explained that Erker "had an app where he could create dozens and dozens and dozens of fake phone numbers from which to text [her] from." Even when G.S. blocked the phone numbers, Erker would create new ones. She stated that Erker initially sent her a number of "fake" emails and created new email accounts when she would block others, but that he eventually switched to the "phone number situation." She also testified that Erker "would deluge [her] with overnight messaging because he knew he could get [the messages]

through before [she] would block the number and [she] would wake up to sometimes 40 or 50 [messages]." She said that he also left messages for her at work that filled up her work phone line's voicemail.

{¶ 36} The state presented screenshots that G.S. took of the texts that Erker sent, which included messages such as:

— So much for you NOT uprooting your kids again! You are literally straight crazy! Goodbye[.]

— Don't come crying when I move on this time[.] I've been more than patient & you've completely over reacted [sic] I've been more than patient[.]

— Seriously?! Damn it [G.S.]! What is your freakin [sic] game plan? Let me ask you this... How's your current approach to life working for you so far?

— FUUUUUUUUUUCK YOOOOOOOUUU! I don't deserve this shit!

{¶ 37} The above messages were sent from various phone numbers. In response to the above messages, G.S. informed Erker to "cease and desist" from contacting her. G.S. explained that she told Erker to "cease and desist from contacting her" because her attorney advised her to do that once she began to seek a civil protection order.

{¶ 38} The state also presented screenshots that G.S. provided showing pages and pages of phone numbers calling her "crazy" and a "horrible human being" as well as her responses to many of the phone numbers to "cease and desist" from contacting her. It also introduced 35 pages of screenshots from G.S.'s phone, showing she blocked what appears to be over one hundred phone numbers as well as numerous email addresses.

{¶ 39} Further, the state presented messages from Erker where he stated that he would "knock her out" "without a second thought," indicated that he was following her by asking whose car was at her apartment and telling her what time she worked until, threatened to contact her boss, and told her she was crazy. In response to a number of texts, G.S. responded "Stop contacting me. It's over. I AM DONE. DO NOT ESCALATE. DO NOT CALL MY WORK ANYMORE. DO NOT SHOW UP ANYWHERE. IT IS OVER. I CANT [*sic*] BE MORE CLEAR OR MORE CERTAIN." She also responded to more texts from Erker, telling him to "Stop creating new phone numbers and let it go." G.S. then basically stopped responding to Erker's messages.

{¶ 40} Despite this, Erker continued to contact G.S. sending multiple text messages. He stated, "Great news is, now, I've earned so many free points — [I] can get a new line for 1 month for just — $1." He also texted her, "I'm not going away — get ahold of me or I'm telling everyone — everyth[ing]."

{¶ 41} C.S. testified that she also blocked Erker's phone number and that he contacted her through false phone numbers.

{¶ 42} On January 24, 2018, G.S. requested a civil protection order. She attended a hearing with her attorney, and the domestic relations court granted her an ex parte civil protection order.

{¶ 43} On February 27, 2018, the domestic relations court dismissed the ex parte civil protection order upon agreement by both parties. G.S. stated that while she ultimately agreed to dismiss the protection order, she was confused by what she

was agreeing to. She stated that she did not want Erker to contact her and that she understood the order as still requiring each of them to stay away from one another. G.S. stated that she did not refile a petition for a domestic violence protection order because she thought that Erker might just leave her alone.

{¶ 44} On March 15, 2018, G.S. went to a doctor's appointment in Westlake. She said that as she left the appointment and headed to work, she "sensed in [her] peripheral vision a car just driving alongside of me" and that it was Erker. She said Erker was "gesturing wildly and waving his arms" and that she did not know what to do so she pulled into a Starbucks, thinking he would not follow her into a public place. G.S. said Erker did follow her, however, and that she told him to leave her alone. When G.S. got into her vehicle to leave, Erker stood in the open passenger's door and was telling her that she needed help and that she had bipolar or borderline personality disorder. G.S. was scared and upset and took pictures of Erker squatting down inside the passenger door to her car, which the state introduced at trial. G.S. said that they began arguing and that she expressed that she wanted some of her belongings from his house back. She said someone called the police who showed up and took both of their driver's licenses. G.S. said that police stayed until she was in her car and able to drive away.

{¶ 45} The next day, on March 16, 2018, C.S. went to school around 7:30 a.m., leaving through the back door that she left unlocked. She drove her mother's car to school, which was right next to her mother's work. When she pulled into her mother's parking lot, she saw Erker's car and saw him inside the car. She said she

was scared and saw him exit his car and approach her. She said Erker "looked in the car and saw it was [C.S.] and not [G.S.] and * * * [she] saw that he had a bunch of papers in his hand[.]" She said she drove off and that when she returned, Erker was gone.

{¶ 46} G.S. was working from home that day because she had numerous teleconferences. She said that she had a teleconference that morning, which finished around 9 a.m. She said that as she was finishing, she saw Erker's car pull in her driveway. She said she did not know what to do and went to the basement to hide, hoping that Erker would think she was not home and leave. Erker pounded on the front door and then went around to G.S.'s back sliding-glass door and began pounding again. As mentioned, when C.S. left for school, she left the sliding glass back door unlocked, and Erker eventually opened the door and went inside. G.S. heard Erker "walking all over the first floor" and calling her name. Eventually, Erker went down to the basement and found G.S. Erker tried talking to G.S., but she told Erker to get out and that he could not be here. She said that Erker left a few moments later when he saw that she was holding her cell phone. G.S. denied ever inviting Erker over.

{¶ 47} G.S. was shaken by the incident and called 911 after Erker left. Officers responded to the scene and spoke with G.S., and charges were issued against Erker that same day.

{¶ 48} In April 2018, G.S. and C.S. moved to North Olmsted. G.S. stated she was still receiving "numerous texts all on these fake phone numbers all the time."

She said that she did not tell Erker that she and C.S. were moving, but that when she pulled up to her North Olmsted home with the moving truck, "there was a bunch of stuff piled up in front of my garage door from [Erker's] house."

{¶ 49} After moving into her North Olmsted home, G.S. got a new phone and traded in her old one based on a deal with her cable company. She said that her text messages did not transfer to her new phone.

{¶ 50} During trial, G.S. explained that she did not screenshot all of the text messages between her and Erker because she would have had to take "thousands" of screenshots that would have rendered her phone unusable. Instead, she took pictures of text messages from "each number because [she] wanted to document how many numbers were created." She also stated that Erker showed her how he could create fake text messages that looked like they came from her, but actually were created by him.

{¶ 51} G.S. also testified about an incident that occurred on April 1, 2018, which she described as follows:

> My mom and I had planned to go to dinner and then to mass where I work and we met for dinner. I was facing outward looking at the street and she was facing the restaurant and I kept seeing a black BMW going back and forth and I got distracted.
>
> She asked me what I was looking at and I said, I think he's here. I think he's going back and forth. We finished our dinner and when we went out to the parking lot he approached us. * * * He had a ham in his hands and he said something like, This is a peace offering, or something, and I said, You can't be here. You can't be near me. * * * My mom and I got into my car and drove away and went to mass. * * * So after mass[,] * * * I went home to North Olmsted, * * * and as I pulled down the street I saw lights come on. A car was parked over against the curb. I thought,

he's here, and I pulled into my driveway and he pulled in behind me and then he got out and proceeded to come up to me in my own yard to try to talk to me. I kept saying, Go home. You can't be here. You can't be here. And so I went inside and locked the door and he left.

{¶ 52} When asked on cross-examination whether she tried to reconcile her relationship with Erker for monetary reasons, G.S. stated, "[a]bsolutely not. If it was for money, I would have tried to take what I could have taken in the divorce. I wanted to get back with him because I loved him and because I invested a great deal in him and in building our step-family, and our children were close to one another." She stated that while she had asked Erker for money in the past, it was because she became financially dependent on him during their marriage for a period after he convinced her to quit her job from late 2013 to 2015. She stated that she went back to work to become independent again.

{¶ 53} The state rested, and Erker moved for dismissal of the charges pursuant to Crim.R. 29, which the trial court denied.

{¶ 54} Erker then presented testimony from a number of acquaintances who testified about their encounters with Erker and G.S. and that their relationship seemed pleasant.

{¶ 55} Erker rested and renewed his Crim.R. 29 motion, which the trial court denied.

{¶ 56} The jury found Erker guilty of all counts. Erker moved for a new trial and another motion for acquittal, which the trial court denied. Because Erker was

convicted of a second-degree felony, which carried a presumption of prison, the trial court remanded Erker to jail until sentencing.

{¶ 57} The trial court sentenced Erker to two years of community control on each count. As part of his community control, the trial court set a number of conditions, including 40 hours of community work service, obtain/maintain verifiable employment, and provide proof of employment. The trial court ordered Erker to pay costs and supervision fees. The trial court also ordered Erker to have no contact with G.S. or her family and to not encourage his friends or family to contact them either. The trial court advised Erker that violating those conditions could result in more restrictive sanctions and also advised him of postrelease control.

{¶ 58} It is from this judgment that Erker now appeals.

## II. Law and Analysis

### A. Sufficiency

{¶ 59} In his first four assignments of error, Erker argues that his convictions were not supported by sufficient evidence.

{¶ 60} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at *id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed. 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

### 1. Burglary and Menacing by Stalking

{¶ 61} Erker was convicted of burglary in violation of R.C. 2911.12(A)(1), which states, "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense."

{¶ 62} Erker argues that there was insufficient evidence that he (1) was at G.S.'s home, (2) entered the structure with force, stealth, or deception, and (3) acted with purpose to commit the underlying offense of menacing by stalking when he entered G.S.'s home.

{¶ 63} G.S. testified that Erker entered her home on March 16, 2018. While Erker argues that there was no DNA, footprint, or fingerprint evidence, G.S.'s testimony alone, viewed in a light most favorable to the prosecution, is sufficient evidence that Erker was inside G.S.'s home. *See State v. Caraballo*, 8th Dist. Cuyahoga No. 89775, 2008-Ohio-5248, ¶ 30 ("[The victim's] testimony alone,

viewed in a light most favorable to the prosecution, is sufficient [to] 'place' Caraballo at [her] home for the purpose of trespass[.]").

{¶ 64} Next, Erker argues there was insufficient evidence that he entered G.S.'s home by force, stealth, or deception because the sliding-glass back door was unlocked and not damaged.

{¶ 65} Erker relies on *State v. Casino*, 8th Dist. Cuyahoga No. 87650, 2006-Ohio-6586, in support of his argument that entering a structure through an unlocked door is insufficient to constitute force. In that case, a family who lived on the second floor of a duplex found the intoxicated defendant using their bathroom and found his personal belongings in their kitchen. The jury convicted the defendant of burglary, but this court reversed his conviction on appeal, finding there was no evidence that the defendant used force to enter the apartment. *Id.* at ¶ 15. After reviewing one family member's testimony, which included information that the side door to the duplex and the door to the upstairs apartment could have been left open, the court stated, "In the absence of any evidence that the doors to the habitation were locked before [the defendant's] entry, or were damaged by his use of force in gaining entry, there is insufficient evidence of force to support a conviction for burglary in violation or R.C. 2911.12(A)(4)." *Id.* at ¶ 16.

{¶ 66} We decline to follow *Casino* here, however, because it failed to analyze or mention, let alone follow, prior cases in which the Eighth District held that entering through an unlocked door is sufficient to constitute force for purposes of burglary under R.C. 2911.12(A). In *State v. Johnson*, 8th Dist. Cuyahoga No.

51957, 1987 Ohio App. LEXIS 6802 (Mar. 26, 1987), we held that "gaining access through an unlocked door is sufficient force under R.C. 2911.12." *Id.* at 4. We noted that "[f]orce is defined in R.C. 2901.01(A) as 'any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.'" *Id.* We concluded, "Defendant must have forced open a closed but unlocked door. This forcing open may have been accomplished by defendant using his strength to turn the doorknob and pushing the door open." *Id.* In reaching that conclusion, the *Johnson* panel found "no indication from the statutory definition that the General Assembly intended to exclude the forcing open of closed but unlocked doors from the definition of force." *Id.*

{¶ 67} Similarly, in 2005, a year before *Casino* was decided, the Eighth District held that "opening a closed door, even one that is unlocked, is sufficient to establish force." *State v. Knuckles*, 8th Dist. Cuyahoga No. 86053, 2005-Ohio-6345, ¶ 24, citing *Johnson* and *State v. Wohlfeil*, 8th Dist. Cuyahoga No. 51983, 1987 Ohio App. LEXIS 6923 (Apr. 2, 1987).

{¶ 68} Finally, in 2008, after *Casino*, 8th Dist. Cuyahoga No. 87650, 2006-Ohio-6586, in *State v. Harris*, 8th Dist. Cuyahoga No. 90699, 2008-Ohio-5873, this court held that the defendant's entrance "through a closed but unlocked rear door" constituted force. *Id.* at ¶ 24. While *Harris* analyzed the sufficiency of evidence for the defendant's conviction for aggravated burglary under R.C. 2911.11(A), the element of force is the same for that required for burglary under R.C. 2911.12(A).

{¶ 69} We agree with the analysis in *Johnson*, *Knuckles*, and *Harris* and find that Erker's opening of G.S.'s unlocked back door constituted "force" as required under R.C. 2911.12(A)(1) and defined in R.C. 2901.01(A). Further, this holding aligns with that of other appellate districts. *See State v. Kelly,* 6th Dist. Fulton No. F-11-002, 2011-Ohio-5687, ¶ 9-13 (declining to follow *Casino* and finding that opening an unlocked, but closed door, constitutes "force" for purposes of a burglary conviction); *State v. Tomak*, 10th Dist. Franklin No. 03AP-1188, 2004-Ohio-6441, ¶ 15 ("Contrary to defendant's contention, opening an unlocked door or entering through an open door satisfies that element of the burglary offense."); *State v. Hibbard*, 12th Dist. Butler Nos. CA2001-12-276 and CA2001-12-286, 2003-Ohio-App. LEXIS 676, 13-17 (Feb. 18, 2003) (merely opening a closed, unlocked door is sufficient to constitute force); *State v. McWilliams*, 2d Dist. Greene No. 2000 CA 89, 2001 Ohio App. LEXIS 4601, 7 (Oct. 12, 2001) (same).

{¶ 70} Erker also relies on *State v. Isom*, 8th Dist. Cuyahoga No. 78959, 2001 Ohio App. LEXIS 5312 (Nov. 29, 2001), in which this court overturned the defendant's conviction because there was no evidence of forcible entry: the victim stated she did not know how the defendant entered her garage and admitted that one of the doors into the garage was left open. *Id.* at 8-9. *Isom* is distinguishable from the instant case because during trial, G.S. testified that she heard Erker pound on the front and back doors. When G.S. did not answer (and instead went to hide in the basement), Erker entered her home by opening the unlocked sliding glass door

and walking inside. Unlike *Isom*, there was evidence that Erker did not walk through an already opened door, but instead opened the back door using force.

{¶ 71} Therefore, contrary to Erker's assertions, there was sufficient evidence that he entered G.S.'s home through force as is required under R.C. 2911.12(A)(1). Having found sufficient evidence of force, we need not address Erker's arguments as to whether there was sufficient evidence that he entered G.S.'s home through stealth or deception. *Knuckles* at ¶ 24.

{¶ 72} Next, Erker argues that there was insufficient evidence to show that he entered G.S.'s home with the purpose to commit the underlying offense of menacing by stalking in violation of R.C. 2903.211(A)(1), which states, "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person[.]" Specifically, he states that there was insufficient evidence that G.S. "was afraid for her safety and/or suffering from mental distress" on the day of the burglary. He also argues that there was insufficient evidence to show that he committed menacing by stalking as charged separately in the indictment.

{¶ 73} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Therefore, in this case, it does not matter whether Erker "intended that his actions cause fear of physical harm or

mental distress[;] instead[,] what is important is [whether] he knew his actions would probably result in such fear and mental distress." *Vega v. Tomas*, 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 15, citing R.C. 2901.22(B).

**{¶ 74}** A pattern of conduct is defined as two or more actions or incidents closely related in time. R.C. 2903.211(D)(1). "The incidents need not occur within any specific temporal period." *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 16, citing *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422. Further, two incidents are enough to establish a pattern of conduct for purposes of R.C. 2903.211(A)(1). *State v. O'Reilly*, 8th Dist. Cuyahoga No. 92210, 2009-Ohio-6099, ¶ 34, citing *State v. Rucker*, 12th Dist. Butler No. CA2001-04-076, 2002-Ohio-172.

**{¶ 75}** Mental distress refers to "any mental illness or condition that involves some temporary substantial incapacity or mental illness or condition that would normally require psychiatric treatment." R.C. 2903.211(D)(2). "Mental distress need not be incapacitating or debilitating * * * [and] expert testimony is not required to find mental distress." *Perry v. Joseph*, 10th Dist. Franklin Nos. 07AP-359, 07AP-360, and 07AP-361, 2008-Ohio-1107, ¶ 8. Instead, "[l]ay testimony may be sufficient" to establish mental distress. *Rufener* at ¶ 17. The parties' history is also relevant to establishing the elements of menacing by stalking. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 114, citing *State v. Hart*, 12th Dist. Warren No. CA2008-06-079, 2009-Ohio-997 ("In prosecutions for menacing

by stalking, the victim's belief that the defendant will cause physical harm is an element of the offense which is often intertwined with their past interactions").

{¶ 76} As Erker points out in his appellate brief, this court has previously held that evidence showing that a victim was only "uncomfortable" and "creeped out" by a defendant and that a defendant never threatened, touched, or called a victim is insufficient to satisfy the mental-distress component under R.C. 2903.211(A)(1). *See State v. Beckwith*, 8th Dist. Cuyahoga No. 98497, 2013-Ohio-492, ¶ 16-17; *see also Cleveland Hts. v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736, ¶ 17-25 (finding that the victim's testimony that she was "upset" and "worried" about her children not being able to go where they wanted was insufficient to establish that she suffered mental distress). Erker also points out in his brief that "R.C. 2903.211 was 'not enacted for the purposes of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of physical danger.'" On the other hand, the Eighth District has upheld a defendant's conviction for menacing by stalking when there is evidence that the defendant "knowingly engaged in aggressive and threatening behavior" toward the victim and the victim feared for his or her personal safety. *See O'Reilly* at ¶ 38.

{¶ 77} Erker's burglary in no way, shape, or form can be considered a mere "uncomfortable situation." G.S. never invited Erker to her home that day, hid from him when he arrived, and called the police after telling him to leave. Not only did Erker not leave when G.S. did not answer the door, but he went around and opened

the unlocked back door and then went searching through G.S.'s home until he found her.

{¶ 78} Further, G.S. testified that when she saw Erker's car in front of her house, she immediately went down to the basement to hide so he would think she was not there. When police showed up after Erker had left, Officer Fields testified that G.S. was "visibly upset" and "visibly shaken," "crying off and on," and had a "shaky" voice. He also testified that G.S. "had to take a deep breath sometimes to get back on track when she was telling" officers what happened. Also, looking to the parties' history, this incident took place after numerous incidents in which Erker persistently harassed and threatened G.S. on a number of occasions, which also contributed to G.S.'s mental distress.

{¶ 79} Accordingly, we find that the above is sufficient evidence that Erker caused G.S. to believe that he would cause her mental distress (and that he actually did cause her to suffer mental distress). *See State v. Bilder*, 99 Ohio App.3d 653, 665-666, 651 N.E.2d 502 (9th Dist.1994) (finding sufficient evidence of mental distress based on testimony from the victim's supervisor that the victim was "visibly shaken"). Therefore, viewing the evidence in a light most favorable to the prosecution, we find that Erker's conviction for burglary including the underlying crime of menacing by stalking was supported by sufficient evidence.

{¶ 80} As to his separate conviction for menacing by stalking, Erker argues the evidence was insufficient because there was no evidence that G.S. reasonably believed that Erker would cause her physical harm, no evidence that he knowingly

caused her mental distress, and that G.S.'s testimony that she was distressed was not credible based on the fact that she "voluntarily and willingly saw and communicated" with Erker until January 2018.

{¶ 81} To reiterate, R.C. 2903.211(A)(1) prohibits a defendant from "knowingly caus[ing] another person to believe that the offender will cause physical harm to the other person * * * *or* cause mental distress to the other person[.]" As to whether Erker "knowingly" caused G.S. to believe that she would suffer mental distress from June 1, 2016 to March 16, 2018, G.S. called the police numerous times, and the police spoke with Erker on more than one occasion about not contacting G.S. In fact, Officer Fields testified that he informed Erker multiple times to stop contacting G.S. and to not show up to her workplace or residence. He also testified that he told Erker that failing to stay away from G.S. could result in criminal charges.

{¶ 82} There was sufficient evidence that Erker's actions from June 1, 2016 to March 16, 2018, caused G.S. to believe that Erker would cause her mental distress (and, in fact, actually caused G.S. to suffer mental distress). During that time, Erker showed up uninvited and unannounced to G.S.'s residences and workplace multiple times and physically assaulted her by grabbing her wrists and slamming his face against her hands and knees. Erker also threatened to kill G.S. and "knock her out." G.S. testified that the incidents made her feel scared and caused her to become upset because Erker was unpredictable and volatile. She also called the police on Erker on numerous occasions, and officers who responded to the incidents that occurred on December 25, 2016, and March 16, 2018, described G.S. as visibly shaken and upset.

In fact, Erker even admits in his appellate brief that G.S. testified that she was distressed by Erker's actions.

{¶ 83} As to Erker's argument that G.S.'s testimony was not credible, the credibility of witnesses is a matter primarily for the trier of fact and is not to be considered in a sufficiency argument as credibility goes to the weight of the evidence. Therefore, whether G.S.'s testimony was credible has no bearing on our sufficiency analysis.

{¶ 84} And, as to the fact that G.S. voluntarily contacted Erker up until January 2018, "R.C. 2903.211 does not require that the victim avoid the accused altogether" and "[t]he fact that the victim may have initiated some contacts throughout the relevant time period does not change" the sufficiency analysis under R.C. 2903.211. *State v. Williams*, 9th Dist. Medina No. 02CA0114-M, 2003-Ohio-4533, ¶ 24.

{¶ 85} Therefore, viewing the evidence in a light most favorable to the prosecution, we find that Erker's conviction for menacing by stalking was supported by sufficient evidence.

## 2. Telecommunications Harassment

{¶ 86} Erker was convicted of telecommunications harassment in violation of R.C. 2917.21(A)(5), which states, "[n]o person shall knowingly make or cause to be made a telecommunication * * * to another, if the caller * * * [k]nowingly makes the telecommunication to the recipient * * * and the recipient * * * previously has told the caller not to make a telecommunication [to the recipient]."

{¶ 87} Erker argues that his conviction should be overturned because "although G.S. testified that she sent texts to [Erker] which told him to cease and desist contacting her, * * *[she] never allowed her cell phone to be forensically analyzed by the police and/or prosecutor[.]" He also points to the fact that G.S. repeatedly initiated contact with Erker after sending him the "cease and desist" text messages.

{¶ 88} Most of Erker's arguments, however, go to the weight of the evidence, which, as stated above, requires a different analysis than that required for whether there is sufficient evidence and, therefore, have no bearing on our sufficiency analysis.

{¶ 89} Erker also cites to the case *Parma Hts. v. Barber*, 8th Dist. Cuyahoga No. 93005, 2010-Ohio-3309, in which this court found insufficient evidence to support the defendant's conviction for telecommunications harassment because there was no proof that the victim "made it clear to [the defendant] that she wanted no contact at all from him." *Id.* at ¶ 28. We find that *Barber* is distinguishable.

{¶ 90} Here, G.S. testified that she told Erker to stop contacting her on numerous occasions, but most definitively in January 2018. The state presented screenshots of G.S. texting Erker, stating "Cease and desist contacting me in any way." Despite telling him to do so, Erker continued to text G.S. Unlike *Barber,* G.S. clearly told Erker on numerous occasions to stop contacting her. Therefore, viewing the evidence in a light most favorable to the prosecution, we find sufficient evidence to support Erker's conviction for telecommunications harassment. *See Delaware v.*

*Boggs*, 5th Dist. Delaware No. 18 CAC 030027, 2018-Ohio-4677, ¶ 18 (sufficient evidence to support the defendant's conviction for telecommunications harassment because the defendant "was aware that [the victim] told him to stop messaging her, but he continued to message her after she told him to stop."); *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 5 and 21 (same); *State v. Mitchell*, 4th Dist. Pickaway No. 15CA18, 2016-ohio-1133, ¶ 14 (same); *State v. Sims*, 2d Dist. Montgomery No. 24763, 2012-Ohio-3106, ¶ 12 (same); *State v. Medardi*, 8th Dist. Cuyahoga No. 93990, 2010-Ohio-3729, ¶ 15-18 (same).

{¶ 91} Based on the above discussion, we overrule Erker's first, second, third, and fourth assignments of error.

### B. Manifest Weight

{¶ 92} In his fifth assignment of error, Erker argues that his convictions were against the manifest weight of the evidence.

{¶ 93} A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. On review of a manifest weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.* Moreover, this court recognizes that the "weight to be given the

evidence and the credibility of the witnesses are primarily for the trier of fact[.]" *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 73, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 94} Erker argues that his convictions for burglary, menacing by stalking, and telecommunications harassment were against the manifest weight of the evidence because G.S. was not credible. He points specifically to the fact that G.S. was inconsistent as to whether the back door was locked and whether she called the police before or after Erker entered her home on March 16, 2018; G.S. told her mother that Erker was never physically violent toward her; G.S. did not provide her phone with all of the text messages to the police; and G.S. initiated communication with Erker on multiple occasions.

{¶ 95} This court has previously recognized that a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial. *State v. Gaughan*, 8th Dist. Cuyahoga No. 90523, 2009-Ohio-955, ¶ 32, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958. Here, the jury heard all of the testimony, including G.S.'s allegedly inconsistent statements, reviewed evidence showing that G.S. initiated contact with Erker, and still chose to believe her and convict Erker.

{¶ 96} Therefore, we cannot say that this is the exceptional case where the jury clearly "lost its way," and we find that Erker's convictions were not against the manifest weight of the evidence. Accordingly, we overrule Erker's fifth assignment of error.

### C. Prosecutorial Misconduct

{¶ 97} In his seventh assignment of error, Erker argues that the trial court erred to his prejudice by allowing "extensive prosecutorial misconduct during closing argument."

{¶ 98} Our review of the record shows Erker failed to object to some of the prosecutor's comments, and thus, waived all but plain error as to those comments. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 169, citing *State v. Slagle*, 65 Ohio St.3d 597, 605 N.E.2d 916 (1992). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The plain-error rule is to be invoked only under exceptional circumstances to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1987). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.*

{¶ 99} The test to determine if there was prosecutorial misconduct during closing arguments is whether the remarks were improper and if so, whether they prejudicially affected the defendant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The record as a whole must be reviewed in its entirety to determine whether the disputed remarks were unfairly prejudicial. *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). The touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L.Ed.2d 78 (1982). Furthermore, an

appellant must show that there is a reasonable probability that, but for the prosecutor's misconduct, the result of the proceeding would have been different. *State v. Loza*, 71 Ohio St.3d 61, 78-79, 641 N.E.2d 1082 (1994).

{¶ 100} Although the prosecution is entitled to considerable latitude in opening and closing arguments, it must nevertheless avoid assertions that are calculated to mislead a jury. *Smith* at 14. It is improper for the prosecution to express its personal belief or opinion as to the guilt or credibility of a witness. *Id.* However, the prosecution is permitted to fairly comment on the credibility of witnesses based on the witnesses' testimony at trial. *State v. Williams*, 8th Dist. Cuyahoga No. 90739, 2012-Ohio-1741, ¶ 12.

{¶ 101} Further, a prosecutor may not invade the realm of a jury by alluding to matters outside of the record. *State v. Baker,* 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19 (2d Dist.). However, "[i]solated comments by a prosecutor are not to be taken out of context and be given their most damaging meaning," and we must review the challenged statements within the context of the entire trial. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996), citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

{¶ 102} Erker points to four different types of misconduct that the state allegedly committed.

## 1. Burden of Proof and Lack of Defense

{¶ 103} Erker argues that the following statements, which he objected to, were prejudicial as they "implied" that Erker had the burden of proof and had "no defenses":

> State:   The judge will read the law to you and throughout that you will not hear any language about a defense to this, to these charges, to menacing by stalking, to telecommunications harassment, to burglary. There's no defenses that, oh, she was crazy too, or she was sending me crazy text messages, too.  No.  Not at all.  You can't consider those as defenses.

> \* \* \*

> State: The detective testified that nobody ever gave him [Erker's] phone.  That could solve the problem right there as well, right? Somebody could have given the detective [Erker's] phone.  There's been no testimony that he doesn't have it anymore.  In fact, I don't know if you all noticed, but during the testimony about messages and all that, [I] looked over and Ray Erker was frantically going through his phone. This is his behavior during trial while \* \* \* [Erker objects] the victim is on the witness stand.  In front of everybody here he is doing something to that cell phone.  I don't know what it is.

{¶ 104} Erker argues that the above statements was prejudicial because "the jury \* \* \* was comprised of lay people with no legal training or understanding of burden shifting or affirmative defenses" and because they suggested to the jury that Erker "had the burden to provide his own cell phone to the police."

{¶ 105} After reviewing the comments above, we do not find that the prosecutor implied that Erker had the burden of proof at trial.  Instead, the prosecutor stated that G.S.'s voluntary communications with Erker and G.S.'s abrasive text messages were not defenses that Erker could raise to avoid conviction.

Further, as to the prosecutor's statement that the detectives never received Erker's phone, it is clear that the prosecutor made that point in response to the defense counsel's overarching theme that G.S. failed to provide detectives or the state with her phone that contained all of the text messages between her and Erker. The prosecutor was not addressing Erker's decision to not testify at trial, but instead addressing the fact that detectives were not able to verify text messages from either Erker's or G.S.'s phone. *See State v. Penix*, 9th Dist. Summit No. 23699, 2008-Ohio-1051, ¶ 26 ("Yet, Penix fails to consider the context of the prosecutor's statements. * * * The record reflects that the prosecutor made these statements in response to defense counsel's overarching theme during closing argument that Penix altruistically approached police of her own accord with helpful evidence and that unlike her codefendants she was not 'looking to cut some deal' or 'get some kind of mitigation.' * * * In considering the entirety and context of the prosecutor's remarks, it seems clear that the prosecutor meant to address Penix's motivation in initially coming forward to the police rather than her decision to not testify at trial."). We cannot say that the prosecutor's remarks deprived Erker of a fair trial in light of the evidence presented and the entirety of the prosecutor's closing argument.

**2. Credibility of G.S. and Denigrating Defense Counsel**

{¶ 106} Erker next argues that the following comments made by the state were improper because they improperly supported G.S.'s credibility:

> State: We had the opportunity to listen to [G.S.] for quite some time on that witness stand. I ask you all to implore your reason and common sense and the life experiences that you all bring to this case to fully

understand [G.S.], and that's up to you, but the suggestion that I have is that you look at her for being honest, for being firm in her convictions[.]

* * *

[G.S.] admitted — when things weren't necessarily in her best interest — people who lie, * * * do they admit to wrongdoing or do they deny wrongdoing?  She was up here telling the truth.

{¶ 107}  Erker did not object to either of the comments, and we review for plain error.

{¶ 108} The prosecutor may not express his or her belief or opinion regarding the credibility of a witness.  *State v. Jackson*, 92 Ohio St.3d 436, 448, 751 N.E.2d 946 (2001).  The prosecutor is, however, permitted to fairly comment on the credibility of witnesses based on the witnesses' testimony at trial.  *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979).

{¶ 109}  Even if improper, we find that the prosecutor's two comments that G.S. was "honest" and truthful did not clearly affect the outcome of the trial and, therefore, do not rise to the level of plain error.  At best, the comments constitute harmless error because even if they were improper, they did not affect Erker's "substantial rights."  *See* Crim.R. 52(A) (a harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" and shall be "disregarded").

{¶ 110} Erker also challenges the following comment that he claims was erroneous because it mischaracterized G.S.'s testimony:

[Defense counsel] said that he had to ask all of those questions to get [G.S.] to admit [that] * * * she got back together with him. I asked her in particular in direct examination about a hockey trip to Pittsburgh that she admitted to. * * * [Defense counsel] didn't have to pry it out of her and say, You're lying. Look at this. She freely admitted after looking at the countless emails.

{¶ 111} Erker did not object to that comment, and we review for plain error. We find none as we do not agree with Erker that the comment "mischaracterized" G.S.'s testimony. G.S. admitted on numerous occasions, on both direct and cross-examination, that she had an off-again, on-again relationship with Erker from June 2016, through March 2018. We find that the prosecutor's comment did not clearly affect the outcome of the trial and did not constitute plain error.

{¶ 112} Erker also challenges the following comments that he claims "improperly insinuated" that his counsel was trying to mislead or trick the jury:

State: I know defense counsel made a big thing about the fact that, you know, he didn't break any windows, he didn't knock down the door, he didn't do anything like that. * * * I submit to you is put to try to trick you into thinking that [Erker objects] you need something like that. You don't. All it takes is some sort of force.

* * *

[Defense counsel] also stated none of these cease and desist, none of these crazy 35 pages of blocked numbers, none of these happened prior to January of 2018. First of all, that's for you to decide, but I ask you this. Is January of 2018, February of '18 in between June of 2016 and March of 2018? I'm not suggesting he's trying to pull the wool over your eyes, but come on.

{¶ 113} In support of his argument that the above constituted prejudicial prosecutorial misconduct, Erker cites to *Smith*, 14 Ohio St.3d 13, 470 N.E.2d 883. In that case, the prosecutor "referred to defense evidence as 'lies,' 'garbage,' 'garbage

lies,' 'a smoke screen,' and 'a well conceived and well rehearsed lie'" and also accused the defense counsel of committing perjury. *Id.* at 14. The Ohio Supreme Court found that there was "no evidence to substantiate" those accusations and that the comments were "well beyond the normal latitude allowed in closing arguments and [] clearly improper." *Id.* The court also found that the conduct was flagrant and prejudicially affected the defendant's rights and could not be cured through the general instruction that closing arguments are not evidence. *Id.* at 14-15.

{¶ 114} We do not find that the prosecutor's isolated remark rises to the level of that in *Smith*. Here, the prosecutor was attempting to tell the jury that Erker did not need to break a window to have used "force" for a burglary conviction as his defense counsel argued. The prosecutor also told the jury that he was "not suggesting" that the defense counsel was trying to pull the wool over their eyes, but was pointing out that Erker's conduct occurred during the dates included in the indictment. Therefore, we do not find that the prosecutor's remarks constituted prosecutorial misconduct and prejudiced Erker and instead find that any error was harmless. *See* Crim.R. 52(A).

### 3. Appealing to Jury's Passion and Prejudice

{¶ 115} Next, Erker argues that the prosecution improperly "enflamed the jury" and attempted to generate sympathy for G.S. with the following statement:

> State: This is not the Jerry Springer show. That is not Jerry. There is no big security guard. * * * If Ms. [G.S.] was your friend, if Ms. [G.S.] was your sister, if Ms. [G.S.] was your daughter[.] [Erker objects] She's a real person. She went through something. This is not some TV show. I ask for you to take into account her body language, her testimony.

{¶ 116} Erker cites to *State v. Hart*, 8th Dist. Cuyahoga No. 79564, 2002 Ohio App. LEXIS 1080 (Mar. 14, 2002), in which this court held that "the prosecutor's act of inciting the jurors' emotions by asking them to put [themselves] in the victim's shoes and to imagine what could have been instead of relying solely on the facts at hand was improper." *Id.* at 7.

{¶ 117} We distinguished *Hart*, however, in *State v. Potter*, 8th Dist. Cuyahoga No. 81037, 2003-Ohio-1338, where the prosecutor stated the following in closing:

> I would suggest this to you though: when you go back to deliberate, would you ask yourself two questions. Number one, would you entrust your child to that defendant to watch, and number two, God forbid that you should have a young child that would be seriously ill or injured, but if you did, who would you want them treated and taken care of[.]

*Id.* at ¶ 55.

{¶ 118} Further, the *Potter* panel stated:

> In reviewing the instant passage, we find no error in the remarks made by the prosecutor. The prosecutor does not invite the jury to "step into the shoes" of the victim, but, rather, asks the jury if they would entrust their children to the appellant's supervision. The appellant cites to [*Hart*] in support of this argument. But unlike *Hart*, the prosecutor in the case at hand did not suggest that the jurors place themselves in the same position as the victim. In *Hart*, the prosecutor incited the jurors' emotions by graphically describing the attack upon the victim. This court determined that reversible error occurred because the prosecutor's act of inciting the jurors' emotions by asking them to "put themselves in the victim's shoes" and to imagine what could have been instead of relying solely on the facts at hand was improper.
>
> In the instant case, the statements of the prosecutor differ substantially from the graphic descriptions offered by the prosecutor during closing arguments in *Hart, supra.* At no point does the prosecutor rely on facts

outside of the evidence, nor does the prosecutor attempt to incite the jurors' emotions by utilizing graphic descriptions of the trauma the victim incurred. At most, the statement with regard to trusting the appellant with your child was irrelevant and harmless at best. There is no evidence to indicate that, absent the remarks of the prosecutor, the jury verdict would have been different in light of the evidence presented at trial.

*Id.* at ¶ 57-58.

{¶ 119} While the prosecutor in this case started to say "if" G.S. was a friend, mother, or sister of the jury members, he did not finish his statement or ask the jury to step into G.S.'s shoes as the prosecutor did in *Hart.* Like *Potter*, the prosecutor did not rely on evidence outside of the record and the incomplete reference that the prosecutor made was harmless at best. Therefore, we find that the prosecutor's statement was not prejudicial and constituted harmless error. *See* Crim.R. 52(A).

### 4. Erker's Use of Cell Phone

{¶ 120} Finally, Erker challenges comments that the prosecution made concerning his use of his cell phone during trial that he claims improperly suggested that he had the burden of proof, improperly commented on his decision not to testify, and directed the jury's attention to his cell-phone use that was irrelevant, inadmissible, and speculative. The comments that Erker challenges are:

State: I don't know if you all noticed, but during the testimony about messages and all that, [I] looked over and Ray Erker was frantically going through his phone. This is his behavior during trial while * * * [Erker objects] the victim is on the witness stand. In front of everybody here he is doing something to that cell phone. I don't know what it is.

* * *

Every time the defense asks Ms. [G.S.] about a question, every time there was a question about who was at whose restaurant, you saw Mr. Erker on his phone during this proceeding.

{¶ 121} Erker claims that the above comments "had the effect of 'back-dooring' the argument" that Erker should have testified in his defense. We do not agree and instead find that the prosecutor was commenting on Erker's reaction to the evidence presented, which the Ohio Supreme Court has held that a prosecutor may do. *See State v. Green*, 90 Ohio St.3d 352, 373, 738 N.E.2d 1208 (2000) (finding the prosecutor did not err "by commenting on Green's demeanor, body language, and lack of any concern during trial"), and *State v. Hill*, 75 Ohio St.3d 195, 203, 661 N.E.2d 1068 (1996) ("Counsel could legitimately point out that Hill did not react when scenes of his dead child were shown."). Given that the prosecutor was allowed to comment on Erker's reaction to the evidence, we find that the above statements were not improper.

{¶ 122} Accordingly, we overrule Erker's seventh assignment of error.

**D. Evidentiary Issues**

{¶ 123} In his sixth and eighth assignments of error, Erker raises evidentiary issues.

{¶ 124} In his sixth assignment of error, Erker argues that the trial court erred by allowing "irrelevant and/or unfairly prejudicial alleged text communications that were outside the dates of the indictment."

{¶ 125} During G.S.'s direct examination, the state asked G.S. questions concerning exhibit No. 59A, and the following exchange occurred:

STATE: Now, this says Ray on the top of it, does it not?

G.S.: Yes.

STATE: Do you know, did you date this text?

G.S.: I did not.

STATE: Do you know for sure what time frame this is from?

G.S.: This is much earlier. I don't know for sure but it's much earlier because he's referencing things that happened while we lived together.

STATE: Is this between June of 2016 and March of 2018?

G.S.: No. I think it's prior to me moving out.

STATE: Do you recall this text message?

G.S.: Yes.

STATE: Can you read it?

G.S.: Sign the house over and leave. I'll fucking kill you. Like end your life. I will murder you.

{¶ 126} Erker did not object to the above testimony and did not object when the state offered the exhibit into evidence at the conclusion of the trial, and therefore, we review for plain error. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 186.

{¶ 127} "'The admission of other-acts evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material

prejudice.'" *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565.

{¶ 128} "'Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character.'" *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15, citing *State v. Curry*, 43 Ohio St.2d 66, 330 N.E.2d 720 (1975).

{¶ 129} Evid.R. 404(B) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶ 130} Evid.R. 404(B) "affords the trial court discretion to admit evidence of other crimes, wrongs, or acts for 'other purposes,' including, but not limited to, those set forth in the rule. Hence, the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." *Williams* at ¶ 17.

{¶ 131} In determining whether to permit other-acts evidence to be admitted, trial courts should conduct a three-step analysis set forth in *Williams*: (1) determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401; (2) determine if the other acts "is

presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)"; and (3) consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.* at ¶ 20.

{¶ 132} In *State v. Barnett*, 2d Dist. Montgomery No. 27660, 2018-Ohio-4133, the court found that the trial court did not abuse its discretion when it allowed the state to introduce testimony regarding the defendant's prior death threats toward his family. *Id.* at ¶ 40. The court stated:

> At trial, AG testified that she did not initially disclose Barnett's abuse to anyone because Barnett was violent and she feared him. Given this testimony, the trial court reasonably concluded that the evidence of Barnett's prior violent acts and threats was admissible to show the basis of AG's fear of Barnett and that her fear was rational. As a result, the evidence of Barnett's prior behavior was not offered to prove that Barnett had bad character or that he acted in conformity with that bad character. Rather, evidence of Barnett's prior behavior gave substance to AG's claimed fear of Barnett and explained why AG delayed disclosing the sexual abuse. The prior bad acts evidence in question was therefore offered for a reason other than showing conformity with Barnett's character and was relevant in establishing the basis of AG's fear.

*Id.*

{¶ 133} We find that *Barnett's* rationale applies to the instant case. The state's exhibit containing Erker's death threat was not offered to prove that Erker had bad character or acted in conformity with such. Instead, the evidence "gave substance" to the mental distress that Erker caused G.S. as a result of his incessant harassment that occurred after the death threat, which was necessary to prove both

burglary and menacing by stalking.  Further, we do not find that the probative value of the state's exhibit was substantially outweighed by the danger of unfair prejudice. Therefore, we find that all three steps of the *Williams* test was met and overrule Erker's sixth assignment of error.

{¶ 134}  In his eighth assignment of error, Erker argues that the trial court abused its discretion and prejudiced him by allowing testimony concerning Erker's ankle bracelet to be admitted into evidence, by failing to give a curative instruction, and by denying Erker's motion for a new trial based on that inadmissible testimony.

{¶ 135}  During trial, Erker called Mark Lowbridge, a friend, as a witness. On cross-examination, the following exchange occurred while the state was asking Lowbridge about when he found out he was subpoenaed to testify:

STATE:      So what did you do at that point?

WITNESS:    I called Ray.  I said I got a subpoena.

STATE:      What did Ray tell you?

WITNESS:    He said the proceeding has been rescheduled.

STATE:      Okay. And at that point what was your knowledge about — what type of proceeding did you think he was talking about?

WITNESS:    I knew he was in trouble.

STATE:      How did you know that?

WITNESS:    Because he's wearing an ankle bracelet.

Erker's defense counsel objected and asked to approach, but the trial court denied the request.  The prosecution then asked Lowbridge if he followed up on his

observation and said he spoke with Erker who said, "[a]s I told you, I got in some trouble[.]"

{¶ 136} At the beginning of its instructions to the jury, the trial court stated, "I also want to instruct you that there was some mention of the defendant having an ankle bracelet. It is not for your consideration. It has nothing to do with your decision in this matter."

{¶ 137} Erker subsequently moved for a mistrial. In denying the motion, the trial court noted that the state did not elicit Lowbridge's testimony regarding the ankle bracelet and that Lowbridge "just offered that[.]" It stated, "Defense counsel asked for a curative instruction, which I gave and which defense counsel agreed to, that it was appropriate. And there was no objection to the curative instruction."

{¶ 138} Erker argues that the testimony regarding his ankle bracelet was "tremendously" prejudicial because it implied that he was "a dangerous person who needs to be on continuous monitoring by the authorities[.]" Erker cites to *State v. Watters*, 8th Dist. Cuyahoga No. 82451, 2004-Ohio-2405, and *State v. Allen*, 29 Ohio St.3d 53, 506 N.E.2d 199 (1987), in support of his argument. In *Allen*, the court held:

> The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand. For this reason, we do not consider the trial court's admonitions to the jury that appellee's prior convictions are immaterial to his guilt of the present charge sufficient to cure the error. Nor are we persuaded that appellee

would have been convicted absent the disclosure to the jury of appellee's two prior convictions.

*Id.* at 55.

**{¶ 139}** *Allen* is clearly distinguishable as Lowbridge's unelicited reference to Erker's ankle bracelet is not the same as testimony concerning a prior offense. Further, it is clear from Lowbridge's testimony that Erker wore the ankle bracelet due to the charges in the instant case, which is different than the subject matter in *Allen* concerning prior offenses. Therefore, Lowbridge's testimony was not something that would allow the jury to convict Erker based on past misconduct.

**{¶ 140}** In *Watters*, this court held that while the comments regarding defendant's status in jail were improper, those comments "did not affect the outcome of the case in light of the overwhelming evidence against Watters" and, therefore, did not "unjustly prejudice Watters in the full context of this trial." *Id.* at ¶ 16. We find that, contrary to Erker's argument that *Watters* supports a finding of prejudice, *Watters* instead supports our finding that the off-hand comment regarding Erker's ankle bracelet was not prejudicial.

**{¶ 141}** Further, there is a presumption that a jury follows all of the court's instructions, including curative instructions to disregard testimony. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). "The presumption that curative instructions remedy a mistake, however, can be rebutted by showing that the evidence could not have been ignored and that serious prejudice likely occurred." *State v. McMiller*, 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844,

¶ 48, citing *United States v. Gonzalez-Vazquez*, 219 F.3d 37 (1st Cir.2000). We find nothing in the record to conclude that the jury declined to follow the court's curative instruction, and Erker has not shown that Lowbridge's testimony could not have been ignored. Accordingly, we also find that the trial court did not err in denying Erker's motion for a mistrial.

{¶ 142} Accordingly, we overrule Erker's eighth assignment of error.

**E. Jury Instructions**

{¶ 143} Finally, in his ninth assignment of error, Erker argues that the trial court erred to his prejudice by "providing confusing, misleading, and prejudicial jury instructions."

{¶ 144} When instructing the jury, a trial court is required to provide "a plain, distinct, and unambiguous statement of the law applicable to the evidence." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 73, citing *Marshall v. Gibson*, 19 Ohio St.3d 10, 482 N.E.2d 583 (1985). "'Further, generally jury instructions are viewed in their entirety to determine if they contain prejudicial error'" and "'even if a jury instruction was inappropriate, if it did not materially affect the outcome of the case, a reversal of the judgment is not justified.'" *State v. Campbell*, 11th Dist. Ashtabula No. 2014-A-0005, 2014-Ohio-4305, ¶ 28, quoting *State v. Shaffer*, 11th Dist. Trumbull No. 2011-T-0036, 2003-Ohio-6701.

{¶ 145} The portion of the jury instructions that Erker claims was confusing, prejudicial, and misleading concerned the court's instruction on the

lesser-included charge of burglary. The court began explaining the lesser-included offense, but then stopped and held a sidebar with counsel. It then reinstructed the jury on the lesser-included offense of burglary, which included the following statement: "The initial charge of burglary and the lesser[-]included offense of burglary is distinguished in that the lesser offense does not require the state to prove beyond a reasonable doubt that the entrance was to commit a criminal offense, to wit, aggravated menacing." After the court finished its instruction, the prosecution interrupted to correct the trial court's statement to substitute "menacing by stalking" for "aggravated menacing." The trial court then repeated that portion of its instruction with the correct term.

{¶ 146} Later, when instructing the jury on menacing by stalking, the prosecution interrupted again, and the trial court, state, and defense counsel agreed to the instruction including "cause to believe that there will be physical harm or mental distress."

{¶ 147} Erker did not object to the trial court's instructions, and therefore, he has waived all but plain error. *State v. Ruppart*, 187 Ohio App.3d 192, 2010-Ohio-1574, 931 N.E.2d 627, ¶ 8 (8th Dist.). To establish plain error, Erker must show that, but for the error, the outcome of the trial would have been different. *Id.*

{¶ 148} While there were a few interruptions during the trial court's instructions, we do not find that the trial court failed to "provide an unambiguous statement of the law" as Erker argues. In regards to the instruction on the lesser-included offense, the prosecution correctly noted the trial court's misstatement,

which the trial court then corrected by rereading the corrected statement in its entirety to the jury. As to the menacing-by-stalking instruction, the prosecution again interrupted to ensure that the trial court's instruction properly reflected the elements for the charge as listed in R.C. 2903.211. Erker's defense counsel agreed to the correction. While the trial court did not repeat the instruction in its entirety, the written jury instructions included the correct language.

{¶ 149} When looking at the trial court's jury instructions as a whole, we find that the minor oral corrections did not mislead the jury, affect the outcome of the trial, and, therefore, did not constitute plain error.

{¶ 150} Accordingly, we overrule Erker's ninth assignment of error.

{¶ 151} **In light of the conflict discussed in the sufficiency analysis, we, sua sponte, certify the following question for review by the Supreme Court of Ohio: "Whether R.C. 2903.211(A)(1) requires an alleged stalking victim to show actual mental distress or whether it is sufficient that the alleged victim show only that he or she believes that the alleged stalking will cause him or her mental distress."**

{¶ 152} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR