[Cite as *State v. DiSabato*, 2019-Ohio-3542.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY


STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO. 14-18-23

     v.

MICHAEL H. DISABATO,            O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Marysville Municipal Court
Trial Court No. 17 CRB01010

Judgment Affirmed in Part, Reversed in Part
and Cause Remanded

Date of Decision:   September 3, 2019


APPEARANCES:

    *Jeff Ratliff* for Appellant

    *Rick Rodger* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Michael H. DiSabato ("DiSabato"), appeals the October 18, 2018 judgment of sentence of the Marysville Municipal Court. For the reasons that follow, we affirm in part and reverse in part.

{¶2} On October 25, 2017, DiSabato's longtime acquaintance, Bret Adams ("Adams"), filed a report with the Dublin Police Department alleging that he had received a series of threatening phone calls and text messages from DiSabato. (*See* Defendant's Exs. A, B). To support his allegations, Adams produced a collection of screenshots taken from his cell phone purporting to depict some of the unwanted communications. (*See* State's Ex. 1); (*See* Defendant's Exs. E, D). These screenshots reflect that a person identified as DiSabato sent various messages in a group text message thread that included DiSabato, Adams, and another individual. (*See* State's Ex. 1); (*See* Defendant's Ex. D). These messages include statements such as "Winter is Coming" and the phrase "TicToc" followed by two rodent emojis. (*Id.*); (*Id.*). Eventually, Adams requested that DiSabato "not contact [him] any further" and indicated that he would communicate through DiSabato's attorney. (Aug. 27, 2018 Tr. at 81); (State's Ex. 1); (Defendant's Ex. E). Adams also threatened to file a police report if DiSabato continued to contact him. (*Id.*); (*Id.*); (*Id.*). However, DiSabato sent text messages in response to Adams's no-contact

instruction, prompting Adams to issue two more warnings to DiSabato. (State's Ex. 1); (Defendant's Ex. E).

{¶3} A criminal complaint was not filed directly in response to Adams's October 25, 2017 report. Instead, DiSabato was warned by law enforcement officers not to contact Adams further, and the Dublin prosecuting attorney sent a letter to DiSabato advising him to cease all contact with Adams. (*See* Defendant's Exs. A, C, P). Nevertheless, according to Adams, he continued to receive harassing communications from DiSabato. As a result, Adams insisted that charges be brought against DiSabato. (*See* Defendant's Exs. J, L, O, S). However, the investigating officer assigned to the case concluded that DiSabato had not violated the directives not to contact Adams and declined to "pursu[e] criminal charges unless more documentation [was] presented." (*See* Defendant's Exs. S, T). Thus, despite a series of increasingly acrimonious emails from Adams in which he expressed frustration that DiSabato was not being charged, the case was initially placed on inactive status on November 30, 2017. (*See* Defendant's Exs. A, O, S, T).

{¶4} On December 4, 2017, Adams, pro se, filed a civil complaint in the Union County Court of Common Pleas alleging that DiSabato had defamed him by falsely stating that he "was the boyfriend of an adult film star," "practicing law without a license," and "sexually and racially harass[ing] a mutual acquaintance *

* *." (*See* Defendant's Ex. Y). On December 16, 2017, DiSabato sent a series of text messages to Adams's cell phone. (State's Ex. 2); (*See* Defendant's Exs. V, X). DiSabato acknowledged sending the text messages, but he maintained that the messages were intended to provide Adams "with information which clearly shows that his claims in the suit he filed * * * are fabricated and delusional" and that he had to send this information directly to Adams because Adams was representing himself in the civil suit. (State's Ex. 6); (Defendant's Ex. X). After receiving these text messages, Adams immediately contacted law enforcement officials and the Dublin prosecuting attorney to request that they "take action" to stop further communications from DiSabato. (*See* Defendant's Ex. V).

{¶5} On December 21, 2017, a criminal complaint was filed in the Marysville Municipal Court charging DiSabato with one count of telecommunications harassment in violation of R.C. 2917.21(A)(5), a first-degree misdemeanor. (Doc. No. 1). On February 13, 2018, DiSabato entered a written plea of not guilty. (Doc. No. 9).

{¶6} A jury trial was held on August 27, 2018. (*See* Doc. Nos. 21, 40, 41). At the close of the State's case, DiSabato made a motion for acquittal under Crim.R. 29(A), which the trial court denied. (Aug. 27, 2018 Tr. at 215-220). At the close of his own case, DiSabato renewed his Crim.R. 29(A) motion for acquittal, which the trial court denied again. (*Id.* at 231-232). After deliberating for approximately

two hours, the jury returned with its verdict, and the trial court announced that the jury had found DiSabato guilty of the single count of telecommunications harassment. (*See* Doc. No. 40); (Aug. 27, 2018 Tr. at 276-277, 279). At that point, the following exchange occurred:

[Trial Court]:        And beneath [the printed information on the verdict form] are ten signatures because I did not excuse the two alternates.  * * * [D]oes either party wish to have the jury polled?

[The State]:        No, Your Honor.

[Defense Counsel]:  No, Your Honor.  Based on that, that the actual – on the Verdict Form, the actual alternates' signature?

[Trial Court]:        The alternates did sign the Verdict Form.

[Defense Counsel]:  Okay, so then the alternates deliberated, Your Honor.  I think that is a violation and we do not have a good verdict of eight jurors[1] and the alternates were to not participate, so we are unaware of the ability that the alternates might have had in deliberation in affecting the group,

---

[1] "In misdemeanor cases juries shall consist of eight."  Crim.R. 23(B).

-5-

as a whole, so I think that the Court has to declare a mistrial.

* * *

[The State]: I'm going to leave it up to the Court, Your Honor. There's still eight jurors who made a decision that it was guilty. They can raise the issue on appeal, if they wish to, but there are still eight jurors that found him guilty.

[Trial Court]: Correct. I'm going to overrule the Motion for Mistrial this afternoon.

(Aug. 27, 2018 Tr. at 276-278). Later, the trial court remarked that its "oversight" resulted in the alternate jurors' presence during jury deliberations. (*Id.* at 279). The trial court then stated that it "should have excused [the alternate jurors] prior to letting [the jury] begin [its] deliberations" but "failed to do that." (*Id.*). Finally, the trial court discharged the jury and adjourned. (*Id.* at 279-280). The judgment entry of conviction was filed on September 5, 2018. (Doc. No. 41).

{¶7} On September 7, 2018, DiSabato filed a motion for a judgment of acquittal after verdict under Crim.R. 29(C) or, alternatively, for a new trial under R.C. 2945.79. (Doc. No. 43). In his motion, DiSabato argued that he was entitled to a judgment of acquittal because the State failed to present sufficient evidence as

to each of the elements of telecommunications harassment under R.C. 2917.21(A)(5). (*Id.*). In the alternative, he argued that he was entitled to a new trial because the alternate jurors' presence during jury deliberations was an "[i]rregularity in the proceedings of the * * * jury * * * by which [he] was prevented from having a fair trial." (*Id.*). On October 2, 2018, the State filed its memorandum in opposition to DiSabato's motion for acquittal or for a new trial. (Doc. No. 44). On October 18, 2018, the trial court denied DiSabato's motion. (Doc. No. 46).

{¶8} On October 18, 2018, the trial court sentenced DiSabato to 180 days in jail. (Doc. No. 45). However, the trial court suspended the entire 180-day jail sentence on condition that DiSabato successfully complete three years of probation and refrain from contacting Adams. (*Id.*). In addition, the trial court ordered DiSabato to pay a $1,000 fine. (*Id.*).

{¶9} On November 13, 2018, DiSabato filed a notice of appeal. (Doc. No. 52). He raises five assignments of error for our review. We consider DiSabato's assignments of error out of order. We begin by addressing DiSabato's fifth assignment of error. Then, we will address his second assignment of error. Finally, we will consider his first, third, and fourth assignments of error.

### Assignment of Error No. V

**The trial court erred when it failed to grant appellant's motion for acquittal after verdict.**

**{¶10}** In his fifth assignment of error, DiSabato argues that the trial court erred by denying his Crim.R. 29(C) motion for acquittal after the verdict. Specifically, DiSabato argues that R.C. 2917.21(A)(5) requires proof that the caller transmitted a telecommunication to specific premises after having been told not to send telecommunications to those particular premises. (Appellant's Brief at 19). He notes that "[t]he only argument made in opposition by the State to [his Crim.R. 29(C)] motion was that there was evidence that this alleged crime happened in Union County[,] Ohio." (*Id.*). According to DiSabato, "[a]lthough the [State's] argument clarifies venue, this argument does not meet the definition of 'premises' and there is nothing on the record that could suffice." (*Id.*).

**{¶11}** "Crim.R. 29(C) permits a trial court, upon motion, to set aside a guilty verdict and enter a judgment of acquittal." *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 8. Crim.R. 29(C) provides:

> If a jury returns a verdict of guilty * * *, a motion for judgment of acquittal may be made or renewed within fourteen days after the jury is discharged or within such further time as the court may fix during the fourteen day period. If a verdict of guilty is returned, the court may on such motion set aside the verdict and enter judgment of acquittal. * * * It shall not be a prerequisite to the making of such

> motion that a similar motion has been made prior to the submission of
> the case to the jury.

"The purpose of a motion for acquittal is to test the sufficiency of the evidence presented at trial." *Willis* at ¶ 9, citing *State v. Terry*, 12th Dist. Fayette No. CA2001-07-012, 2002-Ohio-4378, ¶ 9, citing *State v. Williams*, 74 Ohio St.3d 569, 576 (1996). Accordingly, "we review a trial court's decision on a Crim.R. 29(C) motion for acquittal using the same standard as is used to review a sufficiency of the evidence claim." *State v. Moore*, 3d Dist. Union No. 14-08-43, 2009-Ohio-2106, ¶ 20, citing *State v. Lightner*, 3d Dist. Hardin No. 6-08-11, 2009-Ohio-544, ¶ 11, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995).

{¶12} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the

credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{**¶13**} DiSabato was found guilty of telecommunications harassment in violation of R.C. 2917.21(A)(5). R.C. 2917.21(A)(5) provides:

(A) No person shall knowingly make or cause to be made a telecommunication, or knowingly permit a telecommunication to be made from a telecommunications device under the person's control, to another, if the caller * * *:

(5) Knowingly makes the telecommunication to the recipient of the telecommunication, to another person at the premises to which the telecommunication is made, or to those premises, and the recipient or another person at those premises previously has told the caller not to make a telecommunication to those premises or to any persons at those premises[.]

"'Telecommunication' means the origination, emission, dissemination, transmission, or reception of data, images, signals, sounds, or other intelligence or

equivalence of intelligence of any nature over any communications system by any method, including, but not limited to, a fiber optic, electronic, magnetic, optical, digital, or analog method." R.C. 2913.01(X). "'Telecommunications device' means any instrument, equipment, machine, or other device that facilitates telecommunication, including, but not limited to, a * * * cellular telephone * * *." R.C. 2913.01(Y). "'Caller' means the person * * * who makes or causes to be made a telecommunication or who permits a telecommunication to be made from a telecommunications device under that person's control." R.C. 2917.21(G)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.*

{¶14} DiSabato does not argue that the State failed to present sufficient evidence that he knowingly made a telecommunication to Adams with knowledge that Adams had previously instructed him not to make further telecommunications. Instead, DiSabato argues that R.C. 2917.21(A)(5) requires proof that a

telecommunication was received at particular "premises" and that the caller was warned not to transmit telecommunications to those "premises" or to anyone at those "premises." According to DiSabato, because the State did not present any evidence indicating that Adams received the text messages at a "premises" that DiSabato was warned not to contact, the trial court erred by denying his Crim.R. 29(C) motion for acquittal.

{¶15} In response, the State observes that there "is no case law which supports [DiSabato's] argument." (Appellee's Brief at 14). Indeed, DiSabato has failed to point to any case that directly supports his argument, and our own search has failed to uncover any case that directly supports or undermines his argument. However, we have found some cases that bear on DiSabato's argument, if only indirectly, and these cases suggest that when a telecommunication is made to a mobile telecommunications device or through a service accessible from any number of telecommunications devices, such as an email service or a messaging application, the State need not prove that the telecommunication was received at a specific "premises" to obtain a conviction under R.C. 2917.21(A)(5).

{¶16} The most relevant of these cases is *Delaware v. Boggs*, 5th Dist. Delaware No. 18 CAC 030027, 2018-Ohio-4677. In *Boggs*, the defendant was convicted of one count of telecommunications harassment in violation of R.C. 2917.21(A)(5) after he sent numerous messages to his "ex-paramour" through the

Facebook Messenger application despite her repeated warnings not to contact her through the application. *Id.* at ¶ 2-6. The defendant contested his conviction, arguing that "R.C. 2917.21(A)(5) is vague and unconstitutional because the term 'premises' is not defined by the statute." *Id.* at ¶ 20. He contended that the "statute does not define 'premises' and therefore does not include the internet and/or the Facebook Messenger application as 'premises.'" *Id.*

{¶17} In rejecting the defendant's argument, the court first noted that the defendant had not "provided [the] Court with any authority to support his position that the lack of definition for 'premises' renders R.C. 2917.21(A)(5)" unconstitutionally vague. *Id.* The court described R.C. 2917.21(A)(5) broadly as "prohibit[ing] a person from continuing to make telecommunications after the recipient has told the caller to stop." *Id.* at ¶ 23. To the court, the critical issue was whether R.C. 2917.21(A)(5) "affords a reasonable person of ordinary intelligence fair notice and sufficient definition and guidance that a person is prohibited from continuing to telecommunicate with a recipient after the recipient tells the person to stop the telecommunications." *Id.* at ¶ 24. The court concluded that because the defendant failed to demonstrate that the lack of a definition of "premises" rendered him incapable of conforming his conduct to the law, his void-for-vagueness challenge failed. *See id.*

{¶18} The court also rejected the defendant's claim that his conviction was not supported by sufficient evidence. The defendant's conviction rested on a stipulation of facts that provided that the defendant "sent messages to [the victim] via the Facebook Messenger application," as evidenced by "printouts of screen captures of the messages on [the victim's] smartphone," with knowledge that the victim "had told him to stop messaging her." *Id.* at ¶ 5. However, the stipulation of facts was silent regarding where the victim was when she received the messages. *Id.* Nevertheless, the trial court concluded that based on the stipulation of facts, "there was sufficient evidence to support the criminal conviction under R.C. 2917.21(A)(5)." *Id.* at ¶ 18. According to the court, R.C. 2917.21(A)(5) "prohibits a person from continuing to make telecommunications after the recipient has told the caller to stop" and the defendant "was aware that [the victim] told him to stop messaging her, but he continued to message her after she told him to stop." *Id.* Thus, although the stipulation of facts contained no information concerning the "premises" where the messages were received and the court was aware of the defendant's argument regarding the lack of definition for "premises," the court still concluded that the defendant's conviction was supported by sufficient evidence. *Id.* at ¶ 18-19. *See State v. Erker*, 8th Dist. Cuyahoga No. 107790, 2019-Ohio-3185, ¶ 86-91; *State v. Pariscoff*, 9th Dist. Wayne No. 17AP0023, 2019-Ohio-172, ¶ 2, 5-14 (conviction for violation of R.C. 2917.21(A)(1), which prohibits the making of

a telecommunication with the purpose to harass any person at the premises to which it is made, not against the weight of the evidence despite no discussion in the court's opinion of the premises where more than 28 harassing cell-phone calls were received); *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 5-10, 18-21 (R.C. 2917.21(A)(5) conviction supported by sufficient evidence in the absence of any discussion in the opinion of the premises where the victim received unwanted voice calls, text messages, and Facebook Messenger messages via her cell phone).

{¶19} Although these cases do not explicitly hold that the State is not required to prove that an unwanted telecommunication was received at particular "premises" when the telecommunication in question was received via a mobile telecommunications device or through a service accessible from multiple telecommunications devices, wherever situated, each of these cases, especially *Boggs*, appears to rest on the assumption that no such showing is required. We find merit in this assumption. We believe that implicit in every blanket demand that a caller not send a telecommunication to a mobile telecommunications device is an instruction that the caller refrain from sending telecommunications to the mobile device at any "premises" where the mobile device is located. Thus, we conclude that when a recipient receives a telecommunication via a mobile telecommunications device and has previously told the caller not to send additional

telecommunications to the recipient's mobile telecommunications device, the State does not need to prove that the telecommunication was received by the recipient at any specific "premises" to sustain a conviction under R.C. 2917.21(A)(5).

{¶20} A contrary conclusion would likely prove unmanageable and could create confusion regarding what conduct is proscribed by R.C. 2917.21(A)(5). DiSabato's preferred reading of R.C. 2917.21(A)(5) would place the onus on the recipient to clearly articulate each and every "premises" at which they might be in possession of their mobile telecommunications device. Although a recipient might have the foresight to instruct the caller not to send telecommunications to the recipient's mobile device while the recipient is with their device at home, at the office, at the gym, or at their favorite restaurant, it would be unreasonable, if not impossible, to expect the recipient to provide the caller with an exhaustive list of the "premises" at which they might be in possession of their mobile device. To remain maximally protected by R.C. 2917.21(A)(5), the recipient would be required to remain in frequent contact with the caller, updating the caller on newly forbidden "premises" and perhaps eliciting the very telecommunications the recipient is seeking to avoid. However, even the most diligent of recipients would likely neglect to revise the list of off-limits "premises" on occasion and some unwanted telecommunications may be received before the recipient has had a chance to update their list.

{¶21} Furthermore, in many cases, a caller could not be certain whether a planned telecommunication to a mobile telecommunications device would run afoul of R.C. 2917.21(A)(5). Unless the caller is certain of the intended recipient's whereabouts at all times, the caller would often be required to guess whether the telecommunication was received at an off-limits "premises" or somewhere else. As a result, DiSabato's understanding of R.C. 2917.21(A)(5) would actually impair a person's ability to conform their conduct to the law.

{¶22} Here, viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the elements of telecommunications harassment under R.C. 2917.21(A)(5) proven beyond a reasonable doubt. Viewing the evidence in this light, the record supports that DiSabato knowingly sent a telecommunication to Adams's cell phone with knowledge that Adams had previously warned DiSabato not to send further telecommunications to Adams's cell phone. As we have concluded, R.C. 2917.21(A)(5) requires nothing more. Therefore, the trial court did not err by denying DiSabato's Crim.R. 29(C) motion for acquittal after the verdict.

{¶23} DiSabato's fifth assignment of error is overruled.

**Assignment of Error No. II**

**The trial court committed reversible error when it violated Ohio Criminal Rule 24, Ohio Criminal Rule 31, and R.C. §2945.171.**

{¶24} In his second assignment of error, DiSabato argues that the trial court committed reversible error when it failed to ensure that the two alternate jurors were not present during jury deliberations.

{¶25} In noncapital cases, "[t]he court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). The Supreme Court of Ohio "has consistently stated that allowing alternate jurors to be present during jury deliberations is error." *State v. Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, ¶ 7, citing *State v. Murphy*, 91 Ohio St.3d 516, 531 (2001) (stating "[i]t is generally regarded as erroneous to permit alternates to sit in on jury deliberations") and *State v. Jackson*, 92 Ohio St.3d 436, 439 (2001) (stating "[t]he trial court clearly erred * * * in allowing the alternate jurors to remain present during deliberations"). "'[I]n theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through "body language"; or because the alternates' presence exerted a "chilling" effect on the regular jurors.'" *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 135, quoting *United States v. Olano*, 507 U.S. 725, 739, 113 S.Ct. 1770 (1993).

{¶26} In this case, it is undisputed that an oversight on the part of the trial court resulted in the two alternate jurors being present during jury deliberations. (*See* Aug. 27, 2018 Tr. at 277, 279); (*See* Doc. No. 40). We conclude that the trial court erred by failing to ensure that the alternate jurors did not attend jury deliberations. *Downour* at ¶ 7, 10; *State v. Teitelbaum*, 10th Dist. Franklin No. 14AP-310, 2016-Ohio-3524, ¶ 71.

{¶27} DiSabato and the State both acknowledge that the trial court erred when it failed to exclude the alternate jurors from jury deliberations. (*See* Appellant's Brief at 8-11); (*See* Appellee's Brief at 8). However, they dispute whether the trial court's error constitutes reversible error. DiSabato contends that, in this case, the State had the burden to prove that the alternate jurors' presence in the room during jury deliberations did not prejudice him. (Appellant's Brief at 8). He concludes that the State did not carry its burden because "prejudice must be presumed when the [alternate] jurors actually deliberated and signed the verdict form." (*Id.*). In contrast, the State argues that because DiSabato did not raise an objection to the alternate jurors' presence during deliberations until after the verdict was announced, the trial court's error may only be reviewed for plain error, which requires DiSabato to establish that he was prejudiced. (Appellee's Brief at 5-6, 8-9). According to the State, because the mere presence of the alternate jurors during deliberations does not raise a presumption of prejudice and DiSabato has otherwise

failed to demonstrate actual prejudice, the trial court's error does not amount to plain error. (*See id.* at 4-6, 8-9).

{¶28} To resolve the parties' disagreement, we must first determine the appropriate standard of review. We begin by examining some of the cases in which the Supreme Court of Ohio applied a plain-error standard of review to a trial court's failure to exclude alternate jurors from jury deliberations. In *State v. Murphy*, "the trial court sent the alternate jurors into the jury room to listen to the jury's deliberations" with instructions "not 'to participate in the deliberations in any fashion,' even by 'gestures' or 'facial movements.'" 91 Ohio St.3d at 531. Although the court recognized that the trial court erred by allowing the alternate jurors to be present during jury deliberations,[2] because "no defense objection appear[ed] in the trial court record to the presence of the alternate jurors," the court concluded that the error was subject only to plain-error review. *Id.* at 532-533. The court emphasized that under plain-error analysis, an alleged error """"does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise."""" *Id.* at 532, quoting *State v. Campbell*, 69 Ohio St.3d 38, 41 (1994), quoting *State v. Long*, 53 Ohio St.2d 91

---

[2] *Murphy* and all of the following cases with the exception of *Downour* were decided under a former version of Crim.R. 24, which provided: "[A]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Crim.R. 24(F) (July 1, 1975) (current version at Crim.R. 24(G) (July 1, 2009)). Although the rule has since been amended to allow trial courts to retain alternate jurors even after the jury has retired to deliberate, cases applying the new Crim.R. 24(G)(1) have continued to hold that a trial court errs by allowing alternate jurors to be present during jury deliberations. *See Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, at ¶ 6-7, 10; *Teitelbaum*, 2016-Ohio-3524, at ¶ 67-68, 71.

(1978), paragraph two of the syllabus. The court explained that under plain-error review, prejudice cannot be presumed simply from an alternate juror's presence during jury deliberations. *Id.* at 533. *See Olano*, 507 U.S. at 741 ("Nor do we think that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice * * *."). Rather, "the party complaining of the error has the burden of showing that the alternates disobeyed the court's instructions by participating in the deliberations, either verbally or through body language, or that their presence chilled the deliberative process." *Murphy* at 533, citing *Olano* at 739-741. Because the defense made no showing that the alternate jurors disobeyed the trial court's instructions not to participate in deliberations or that the alternates chilled the deliberative process, the court concluded that the trial court's error was not prejudicial and therefore not plain error. *See id.* at 533-534.

{¶29} The court was presented with a similar situation in *State v. Jackson*. In *Jackson*, as in *Murphy*, the defense was put on notice that alternate jurors would be present during jury deliberations when the trial court advised the alternate jurors to listen to the deliberations but not to participate in any fashion. 92 Ohio St.3d at 439. Nevertheless, "[d]efense counsel did not object, and in fact expressly stated that he had no objection to [the alternate jurors'] presence." *Id.* at 438. As a result, the court concluded that it was limited to reviewing the alleged error for plain error. *Id.* While the court held that the trial court "clearly erred" by allowing the alternate

jurors to remain present during deliberations, the court was "unwilling to presume prejudice" under the facts of the case. *Id.* at 439. Ultimately, because the defendant did not demonstrate that the alternate jurors disregarded the instructions not to participate in deliberations or that they chilled the deliberative process, he failed to show that he was actually prejudiced by the presence of the alternate jurors. *Id.* at 439-440.

{**¶30**} Furthermore, in *State v. Braden*, the trial court instructed the alternate jurors to listen to the jury deliberations but "'not participate under any circumstances in the deliberation unless and until, if ever, they are called upon to serve as a regular juror.'" 98 Ohio St.3d 354, 2003-Ohio-1325, ¶ 45-46. Yet again, "the defense did not object to the alternates' presence during * * * the jury's deliberations and thus waived all but plain error." *Id.* at ¶ 49, citing *Olano* at 741. In conducting its plain-error analysis, the court reiterated that it had "previously refused to presume prejudice when alternates have been allowed to remain present during jury deliberations * * *." *Id.* at ¶ 47, citing *Jackson* at 439. The court ultimately concluded that the defendant failed to demonstrate specific prejudice:

> Neither the conviction nor the death penalty resulted from the presence of the alternates. Nothing in the record suggests that the alternate jurors said anything or participated in any form during the jury's deliberations. Moreover, there is no indication from the record

that the alternates in any way disobeyed the judge's instructions or that their presence chilled the deliberative process.

*Id.* at ¶ 50. Therefore, "although it was improper for the trial court to allow the alternate jurors to remain present during deliberations, plain error [was] absent." *Id.* The court has reached similar conclusions in at least two other cases applying the plain-error standard to violations of Crim.R. 24. *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, ¶ 91-95 (no plain error where there was no evidence that alternates disobeyed the trial court's instructions not to participate in deliberations or that they chilled the deliberative process); *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 116-118 (defendant unable to demonstrate prejudice where there was no evidence that alternates participated in deliberations or exerted a chilling effect on the regular jurors).

{¶31} The foregoing cases can be contrasted with those cases in which the Supreme Court of Ohio reviewed a trial court's violation of Crim.R. 24 to which the defendant objected at trial. In *State v. Gross*, five alternate jurors were permitted to be present with the jury during sentencing deliberations. 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 122-125. Before retiring with the jury to the jury room, the alternate jurors were instructed to "'listen and watch the deliberations'" but not to participate in the deliberations in any way. *Id.* at ¶ 123-124. However, it was soon discovered that at least one of the alternate jurors ignored the trial court's instructions. *Id.* at ¶

125. The trial court received two notes from the jury foreman, the second of which related that one of the alternates was "'expressing his feelings about the other jurors in a manner that he thinks isn't right'" and "'feel[ing] things are going wrong and think[ing] some people are getting pressured in making decisions.'" *Id.* at ¶ 127-128. In response to the second note, the trial court took sworn testimony from the two bailiffs responsible for the jury. *Id.* at ¶ 129. Both of the bailiffs testified that during deliberations, the jury foreman knocked on the door of the jury room and told the bailiffs, "'It's getting out of hand in here, the alternates are throwing pens and thing[s].'" *Id.* They testified that one of the bailiffs suggested that the jury foreman put his concerns in writing, which resulted in the second note received by the trial court. *Id.* At that point, defense counsel unsuccessfully moved for a mistrial. *Id.* The trial court then decided to bring the jury and the alternate jurors back into the courtroom and repeat the jury instructions. *Id.* However, before it could do so, the jury informed the trial court that it had come to a decision. *Id.* at ¶ 129-131. Without reinstructing the jury and alternate jurors as planned, the jury and the alternates were then brought back into the courtroom where the trial court received the recommendation that the defendant be sentenced to death. *Id.* at ¶ 132.

{¶32} The court determined that the alternate jurors' presence during sentencing deliberations constituted reversible error.[3] *Id.* at ¶ 137-138, 140. First,

---

[3] Although a majority of the court agreed that Gross's death sentence should be vacated because of the alternate jurors' presence during sentencing deliberations, the decision was fractured. Justice Cook's lead

-24-

Justice Cook's lead opinion distinguished *Murphy* and *Jackson* on the basis that "Gross's trial counsel *did* object to the presence of the alternate jurors in the sentencing deliberations." (Emphasis sic.) *Id.* at ¶ 134. Once Gross objected to the presence of the alternate jurors, "the burden shifted to the state to demonstrate an absence of prejudice." *Id.* at ¶ 136, citing *Olano*, 507 U.S. at 734 and Crim.R. 52(A). Furthermore, the lead opinion concluded that once the trial court became aware of the alternate jurors' involvement in deliberations and of their disruptive behavior, the trial court "needed to inquire about the extent and effect of the alternates' participation." *Id.*, citing *State v. Hessler*, 90 Ohio St.3d 108 (2000). The lead opinion summarized its holding thusly: "[R]eversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error." *Id.* at ¶ 137.

**{¶33}** In Justice Cook's view, the record was not silent regarding the prejudice Gross suffered; instead, the "record contain[ed] indicia of participation by alternate jurors that create[d] a presumption of prejudice * * *." *Id.* at ¶ 134. Gross "pointed to specific evidence that at least one alternate inserted himself into the actual deliberations through intrusive verbal participation, while more than one

opinion was not joined by any other member of the court. Justice Douglas wrote a short opinion concurring in judgment only, which was joined by Chief Justice Moyer. Finally, Justice Pfeifer wrote an opinion concurring in part and dissenting in part.

alternate participated through nonverbal acts." *Id.* at ¶ 136. The lead opinion observed that courts have construed language in *Olano* as "mean[ing] that 'evidence that an alternate juror participated in jury deliberations is sufficient to demonstrate prejudice.'" *Id.* at ¶ 135, quoting *Manning v. Huffman*, 269 F.3d 720, 726 (6th Cir.2001) and citing *United States v. Acevedo*, 141 F.3d 1421, 1424 (11th Cir.1998) and *United States v. Ottersburg*, 76 F.3d 137, 140 (7th Cir.1996). Therefore, the lead opinion found "specific evidence of active disruption of the deliberative process that pose[d] a significant risk of affecting jury functions * * *." *Id.* at ¶ 137. It concluded that because the State failed to counter the presumption of prejudice, the State did not establish the absence of prejudice. *See id.* at ¶ 136-137. Finally, it found that the trial court accepted the jury's verdict without attempting to cure the error, and it concluded that "[s]uch unaddressed evidence of disruption carries a presumption of prejudice." *Id.* at ¶ 137.

{¶34} In *State v. Downour*, the court, revisiting *Gross*, concluded that the trial court committed reversible error by allowing an alternate juror to attend jury deliberations over objection. In *Downour*, the defendant unsuccessfully objected to jury instructions that permitted an alternate juror to be present in the jury room during deliberations. 126 Ohio St.3d 508, 2010-Ohio-4503, at ¶ 1. The jury then deliberated with the alternate juror present and found the defendant guilty. *Id.* at ¶ 2. After the verdict was returned, the defendant renewed his objection to the

presence of the alternate juror during deliberations and moved for a mistrial. *Id.* The trial court denied the defendant's motion. *Id.*

**{¶35}** In holding that the trial court committed reversible error, a majority of the court embraced Justice Cook's lead opinion in *Gross*. *See id.* at ¶ 8-10. The court clarified that when a defendant objects to the presence of alternate jurors during jury deliberations, "it is the *presence* of the alternate jurors that shifts the burden to the state to show that any error is harmless," rather than the alternate jurors' participation. (Emphasis sic.) *Id.* at ¶ 9. The court concluded that because the defendant objected to the alternate juror's presence, the burden shifted to the State to demonstrate the absence of prejudice. *Id.* at ¶ 10. As "[n]othing in the record indicate[d] that the state established the absence of prejudice," the court reversed the decision of the court of appeals affirming the defendant's conviction and remanded for a new trial. *Id.* at ¶ 10-11.

**{¶36}** After reviewing the record, we find that the instant case is more akin to *Gross* and *Downour* than it is to *Murphy*, *Jackson*, or any of the other plain-error cases. First, and most importantly, unlike the defendants in the plain-error cases, DiSabato objected to the presence of the alternate jurors during deliberations when he moved for a mistrial almost immediately after the jury's verdict was announced. (*See* Aug. 27, 2018 Tr. at 276-277). Yet, the State contends that despite DiSabato's motion for a mistrial, this court is restricted to plain-error review because

DiSabato's objection was not registered "until after the verdict." (Appellee's Brief at 8).

**{¶37}** We disagree. The record does not suggest that DiSabato could have objected to the presence of the alternate jurors during deliberations any earlier than he did. In contrast to *Murphy*, *Jackson*, and the rest of the above-cited cases, the trial court's jury instructions in this case did not indicate that the alternate jurors would be allowed to retire with the jury or caution the alternate jurors specifically not to participate in the deliberations. (*See* Aug. 27, 2018 Tr. at 262-275); (*See* Doc. No. 39). Furthermore, the record does not contain any discussion between the trial court, the State, and DiSabato's trial counsel in which the trial court stated that it was going to let the alternate jurors sit in on deliberations or in which either party requested or acquiesced to the presence of the alternates. Finally, the record reflects that once the jury returned with the verdict, the bailiff passed the verdict form directly from the jury foreman to the trial judge, who then announced the jury's verdict and noted that the alternate jurors had signed the form. (Aug. 27, 2018 Tr. at 276-277). As a result, DiSabato was unable to discover the irregularities in the verdict form until after the trial court had announced the verdict. Thus, the record does not establish that DiSabato had notice of the alternate jurors' presence in deliberations at any time before the trial court read the verdict form into the record, at which point he promptly objected to their presence during deliberations.

Therefore, under the particular facts of this case, we conclude that we are not limited to plain-error review simply because DiSabato first objected to the alternate jurors' presence after the jury had deliberated. *See Acevedo*, 141 F.3d at 1423, fn. 2.

{¶38} Moreover, like in *Gross* and *Downour*, DiSabato objected at a time when the trial court may have been able to take action to neutralize any prejudice caused by the alternate jurors' presence during jury deliberations. The trial court had not yet accepted the guilty verdict and the jury had not yet been discharged. Hence, we find that under the facts of this case, DiSabato raised a sufficiently timely objection to the alternate jurors' presence during deliberations. Accordingly, the burden shifted to the State to demonstrate that DiSabato was not prejudiced by the alternate jurors' presence during deliberations. *Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, at ¶ 10.

{¶39} Having settled on the proper standard of review, we now determine whether the State demonstrated that DiSabato was not prejudiced by the alternate jurors' presence during jury deliberations. Nothing in the record indicates that the State established an absence of prejudice to DiSabato. To the contrary, there is specific evidence in the record suggesting that the alternate jurors participated in the deliberations, which raises a presumption that DiSabato was prejudiced. *See Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 134-137 (evidence that "at least one alternate inserted himself into the actual deliberations through intrusive verbal

participation, while more than one alternate participated through nonverbal acts" created "a presumption of prejudice").

**{¶40}** First, the verdict form was signed by all eight jurors and both of the alternates. (Doc. No. 40). The verdict form includes eight spaces for the jurors to place their signatures, and each of these eight spaces contains a signature. (*Id.*). The remaining two signatures are written in a blank space beneath the column of signature spaces. (*Id.*). At least one of the alternate jurors, K.P., signed the verdict form in one of the eight spaces intended for the actual jurors' signatures. (*Id.*).

**{¶41}** The trial court's jury instructions provide further support for a conclusion that the alternate jurors participated in deliberations. The jury instructions provided, in relevant part:

> Your verdict on each charge must be unanimous. Upon reaching a unanimous verdict, all jurors—all members of the jury must sign, in ink, the Verdict Form that corresponds to your decision for that charge * * *. When you're in agreement, you can circle guilty or not guilty and each person is required to sign beneath the verdict in ink.
>
> * * *
>
> Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide each

charge for yourself but you should do so only after a discussion and

consideration of the case with your fellow jurors.

* * *

The foreman or forelady should see that your discussions are orderly

and that each juror has the opportunity to discuss the case and to cast

a vote.

(Aug. 27, 2018 Tr. at 271-273). Thus, the jury instructions given by the trial court encouraged each juror to participate actively in deliberations and charged the foreperson with a duty to ensure that each juror was involved. Furthermore, the instructions did not distinguish the actual jurors from the alternate jurors, and as noted above, the instructions did not advise the alternate jurors not to participate in jury deliberations. "The jury is presumed to follow the trial court's instructions." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 103, citing *State v. Loza*, 71 Ohio St.3d 61, 75 (1994). Therefore, we must presume that the jurors and the alternate jurors deliberated as a body of ten to deliver a unanimous verdict as directed by the trial court, and the evidence in the record, specifically the verdict form, serves only to bolster, rather than contradict, this presumption. *See Ottersburg*, 76 F.3d at 140. To conclude otherwise, this court would be "required to presume that the alternates did not follow the court's instructions and * * * sat mute in the jury room" for roughly two hours of deliberations. *Id.*

{¶42} In sum, we conclude that the record contains sufficient "indicia of participation by [the] alternate jurors" such that prejudice to DiSabato is presumed. *Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 134-137. *See Manning*, 269 F.3d at 722, 726 (evidence that an alternate juror actively participated in jury deliberations, including an instruction to the alternate to "'take part in the discussions and deliberations,'" was sufficient to demonstrate prejudice); *Ottersburg* at 138-140 (holding that the "substantive participation" of the alternates established prejudice, in part, because the alternates signed the verdict form and "were given no special instructions as to their limited role before they retired with the members of the jury to deliberate"). Moreover, there is no evidence in the record indicating that the State rebutted or attempted to rebut the presumption of prejudice. Therefore, the State failed to sustain its burden of proving the absence of prejudice to DiSabato. Accordingly, the trial court committed reversible error by failing to exclude the two alternate jurors from jury deliberations.

{¶43} DiSabato's second assignment of error is sustained.

### Assignment of Error No. I

**The trial court committed reversible error when it violated Ohio Criminal Rule 23.**

### Assignment of Error No. III

**The trial court erred when it denied Appellant's motion for a new trial.**

## Assignment of Error No. IV

**The trial court erred when it failed to allow evidence to impeach the alleged victim and thereby violated several of Appellant's constitutional rights.**

{¶44} Because we determined under DiSabato's second assignment of error that the trial court committed reversible error, DiSabato's first, third, and fourth assignments of error are rendered moot, and we decline to address them. *See* App.R. 12(A)(1)(c); *State v. Carter*, 3d Dist. Seneca No. 13-17-10, 2017-Ohio-7443, ¶ 21.

{¶45} Having found no error prejudicial to the appellant herein in the particulars assigned and argued with respect to his fifth assignment of error, we affirm the judgment of the trial court as to that matter. However, having found error prejudicial to the appellant herein in the particulars assigned and argued with respect to his second assignment of error, we reverse the judgment of the trial court and remand to the trial court for a new trial or for other further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW and WILLAMOWSKI, J.J., concur.**

/jlr